[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 9, 2007
THOMAS K. KAHN
CLERK

_____

No. 04-13800

_____

D. C. Docket No. 03-02531-CV-CAP-1

TIFFANY WILLIAMS,

Plaintiff-Appellant,

versus

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF
GEORGIA, THE UNIVERSITY OF GEORGIA,
MICHAEL F. ADAMS, and in his official capacities
as President of the University of Georgia and
President of the University of Georgia Athletic Association,
Inc., VINCENT J. DOOLEY, Individually, and in his
official capacity as Athletic Director of the University of Georgia
Athletic Association, Inc., UNIVERSITY OF GEORGIA ATHLETIC
ASSOCIATION INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 9, 2007)**

**ON PETITION FOR REHEARING**

Before TJOFLAT and KRAVITCH, Circuit Judges, and JORDAN,[*] District Judge.

KRAVITCH, Circuit Judge:

We *sua sponte* grant rehearing in this case, vacating our prior opinion filed on March 9, 2006, published at 441 F.3d 1287 (11th Cir. 2006), in its entirety and substitute the following opinion in its place.[1]  While the Court reaches the same result, we address certain claims more fully.

The primary question in this appeal is whether petitioner, a student at the University of Georgia, alleged facts sufficient to withstand defendants' motion to dismiss her Title IX claim based on student-on-student sexual harassment.

## Background

Here, as alleged in her complaint,[2] at approximately 9:00 p.m. on January 14, 2002, Tiffany Williams ("Williams"), then a student at the University of Georgia ("UGA"), received a telephone call from UGA basketball player Tony

---

[*]Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

[1] The Court also vacates its prior order of April 28, 2006 denying the petition for rehearing en banc.

[2] Because the district court disposed of Williams's claims on a motion to dismiss, the facts we state are Williams's allegations, which we must accept as true.  *Covad Commc'n Co. v. BellSouth Corp.*, 299 F.3d 1272, 1276 n.2 (11th Cir. 2002).

Cole. Cole invited Williams to his room in McWhorter Hall, the main dormitory for student-athletes on the university campus. Shortly after Williams arrived at Cole's room, the two engaged in consensual sex. Unbeknownst to Williams, Brandon Williams, a UGA football player, whom Williams did not know, was hiding in Cole's closet. Cole and Brandon had previously agreed that Brandon would hide in the closet while Cole had sex with Williams. When Cole went to the bathroom and slammed the door behind him, Brandon emerged from the closet naked, sexually assaulted Williams, and attempted to rape her.

As Brandon was sexually assaulting Williams, Cole was on the telephone with Steven Thomas, Cole's teammate, and Charles Grant, Brandon Williams's teammate. Cole told Thomas and Grant that they were "running a train" on Williams.[3] Thomas came to Cole's room, and Cole allowed Thomas to enter the room. With Cole's encouragement, Thomas sexually assaulted and raped Williams.

Williams returned to her dormitory at approximately 11:00 p.m., called Jennifer Shaughnessy, and asked Shaughnessy to come to her room. When Shaughnessy arrived, Williams was visibly upset and crying. Williams explained what had happened in Cole's room, and Shaughnessy told Williams that she had

---

[3] "Running a train" is a slang expression for a gang rape.

3

been raped and should call the police.  Williams told Shaughnessy that she did not want to call the police because she was afraid.  While Shaughnessy was with Williams, the telephone rang.  The caller identified himself as Steven Thomas, and Williams immediately hung up.  Thomas had never called Williams before that night.  Minutes later, Thomas called again.  Williams said that she was afraid to answer the telephone, therefore, Shaughnessy answered.  Thomas immediately asked, "Why did you hang up on me?"  When Shaughnessy said "Hello," Thomas asked, "Is Tiffany there?"  Shaughnessy told Thomas that he had the wrong number, and she hung up.

Williams then called her mother, who notified UGA Police of the incident that occurred in Cole's room.  UGA Police arrived at Williams's room shortly after 1:00 a.m. on January 15 and arranged for Williams to have a sexual assault exam performed.  Later that same day, Williams requested that UGA Police process the charges against Cole, Brandon Williams, and Thomas.  After filing her complaint with UGA Police, Williams permanently withdrew from UGA.

UGA Police conducted an investigation, as part of which, the police obtained Cole's telephone records.  The records show that Cole called Williams's dorm room several times in the days immediately following the incident and Williams's withdrawal.  Within forty-eight hours of the incident, UGA's Chief of

4

Police notified UGA's Director of Judicial Programs of the incident and provided her with a written explanation. On April 17, 2002, a lieutenant from UGA Police provided the Director of Judicial Programs with additional information about the investigation. Several of the individuals who spoke with UGA Police supported Williams's allegations.

The actions of Cole, Brandon Williams, and Thomas constitute sexual harassment under the Sexual Harassment Policy of the University of Georgia. The policy applicable in January 2002, however, provided that "[s]exual harassment between students, neither of whom is employed by the University should be treated as a disciplinary matter and should be reported to the Office of Student Affairs" and not dealt with under the Sexual Harassment Policy. Cole, Brandon Williams, and Thomas were charged with disorderly conduct under UGA's Code of Conduct. Additionally, their coaches suspended them from their sports teams after an Athens-Clarke County grand jury indicted them in early April 2002.[4] A UGA judiciary panel, consisting of one staff member and two university students, held hearings almost a year after the January 2002 incident and decided not to

---

[4] Williams alleges that Cole and Thomas did not suffer any negative consequences as a result of the suspension because the basketball season had already ended when they were indicted and that Brandon Williams suffered little or no adversity as the spring football season ended a few days after the indictment.

sanction Cole, Brandon Williams, or Thomas. By the time of the hearing, Cole and Brandon Williams no longer attended UGA. Thomas left UGA in September 2003. The three also faced criminal charges, but a jury acquitted Brandon Williams, and the prosecutor dismissed the charges against Cole and Thomas.

Williams's complaint also alleges that defendants James Harrick, former head coach of UGA's men's basketball team, Vincent Dooley, Athletic Director of the University of Georgia Athletic Association ("UGAA"), and Michael Adams, President of UGA and UGAA, were personally involved in recruiting and admitting Cole even though they knew he previously had disciplinary and criminal problems, particularly those involving harassment of women, at other colleges.

While coaching the men's basketball team at the University of Rhode Island ("URI"), Harrick recruited Cole to attend URI. When Cole could not gain admission to URI, Harrick helped Cole gain admission to the Community College of Rhode Island ("CCRI"). Cole was eventually dismissed from CCRI after allegations that in December 1999 and February 2000 he sexually assaulted two part-time employees of the college's athletic department by groping the women, putting his hands down their pants, and threatening them when they rejected his advances. Cole pleaded no contest to criminal charges of misdemeanor trespass in

6

connection with the two sexual assaults.[5]

Furthermore, while attending Wabash Valley College ("WVC") in Mount Carmel, Illinois, Cole was dismissed from the basketball team because of disciplinary problems, including an incident in which he whistled at and made lewd suggestions to a female store clerk. Adams, Harrick, and Dooley knew of the incident when they recruited and admitted Cole. By the time Cole was dismissed from WVC, Harrick was at UGA and again recruited Cole. Because Cole did not meet UGA's standards for admission, Harrick requested that Adams admit Cole through UGA's special admissions policy. Adams is the sole decision maker when admitting an applicant under the special admissions policy. Cole was admitted to attend UGA on a full scholarship.

Finally, Williams alleges that UGA officials received suggestions from student-athletes that coaches needed to inform the student-athletes about UGA's sexual harassment policy. Despite Adams's and Dooley's duties to ensure student-athletes' compliance with UGA's policy, UGA and UGAA failed to ensure that the student-athletes received adequate information concerning UGA's sexual

---

[5] Additionally, Adams, Harrick, and Dooley knew about several other violent incidents involving Cole, such as Cole's May 2001 arrest for violating a protective order that his foster mother requested after he assaulted one of her friends and an incident in prep school when Cole punched another player in the face during a game.

7

harassment policy applicable to student-athletes and failed to enforce the policy against football and basketball players.

Williams brought suit against: (1) UGA, the Board of Regents of the University System of Georgia ("Board of Regents"), and UGAA for violation of Title IX; (2) Adams, Harrick, and Dooley as individuals and in their official capacities as UGA and UGAA President, former head basketball coach, and Athletic Director of UGAA for violation of 42 U.S.C. § 1983; (3) UGA and the Board of Regents for violation of 42 U.S.C. § 1983; and (4) Cole, Brandon Williams, and Thomas for state law torts. She also sought "injunctive relief ordering the defendants to implement policies, and procedures to protect students like Plaintiff from student-on-student sexual harassment prohibited by Title IX."

UGA, UGAA, the Board of Regents, Adams, Harrick, and Dooley all filed motions to dismiss Williams's claims. Williams then moved to amend her complaint, adding additional factual allegations to support her claims, providing a more specific request for injunctive relief, and requesting declaratory relief against UGA, UGAA, and the Board of Regents. For various reasons we discuss later, the district court dismissed Williams's Title IX and § 1983 claims, denied her requests for declaratory and injunctive relief, and denied in part and granted in part Williams's motion to amend her complaint. The district court also declined to

exercise supplemental jurisdiction over Williams's state law claims. In sum, the district court dismissed all the claims.

Williams now appeals. After a thorough review of the record and the benefit of oral argument, we reverse the district court's decisions to dismiss Williams's Title IX claims against UGA and UGAA and to deny Williams's motion to amend her complaint. In all other respects, we affirm the district court.

**Standard of Review**

We review *de novo* the district court's order granting the defendants' motion to dismiss, *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 722 (11th Cir. 2002), taking the facts alleged in the complaint as true and construing them in the light most favorable to the plaintiff. *Covad Commc'n Co.*, 299 F.3d at 1276 n.2. "A motion to dismiss is only granted when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

We generally review the denial of a motion to amend a complaint for an abuse of discretion, *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003), but we review questions of law *de novo*. *United*

9

*States v. Alaboud*, 347 F.3d 1293, 1296 (11th Cir. 2003).

**Discussion**

Williams raises four issues on appeal – whether the district court erred in: (1) denying Williams's motion to amend her complaint; (2) dismissing her Title IX claims; (3) dismissing her § 1983 claims; and (4) dismissing her claim for injunctive relief.

I. *Whether the District Court Erred in Denying Williams's Motion to Amend Her Complaint*

Williams argues that the district court erred in denying her motion to amend her complaint to file claims for a declaratory judgment against UGA, the Board of Regents, and UGAA. In her first amended complaint, Williams sought declaratory judgments "that defendants [sic] application of its sexual harassment policy to Tiffany Williams was unconstitutional as it denied her equal protection of the laws" and "that defendants [sic] application of its sexual harassment policy to other similarly situated female students who are sexually harassed by other students denies equal protection of the laws." Williams's first amended complaint also contained additional factual allegations. At the time Williams filed her first amended complaint, the Board of Regents, UGA, Adams, and Dooley had filed a motion to dismiss; only Thomas had filed an answer.

10

Federal Rule of Civil Procedure 15(a) states that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Fed. R. Civ. P. 15(a). For purposes of this Rule, a motion to dismiss is not a responsive pleading. *Chilivis v. SEC*, 673 F.2d 1205, 1209 (11th Cir. 1982). If the case has more than one defendant, and not all have filed responsive pleadings, the plaintiff may amend the complaint as a matter of course with regard to those defendants that have yet to answer. *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000).

Here, the clerk of the district court refused to file Williams's first amended complaint until Williams obtained the consent of the opposing parties or leave of court. Williams then filed a motion seeking permission from the court to file her first amended complaint. Apparently believing that Williams could not amend her complaint as a matter of course, the district court analyzed her first amended complaint under another provision of Rule 15(a). The district court permitted Williams to amend her complaint to include additional factual allegations but rejected as futile her claims for declaratory judgments.

The district court erred in failing to allow Williams to file her first amended complaint as a matter of course. When Williams attempted to file her first amended complaint, Thomas was the only defendant who had filed a responsive

11

pleading. Williams's first amended complaint included additional claims against UGA, the Board of Regents, and UGAA, none of whom had filed a responsive pleading. Therefore, Williams had the right to amend her complaint as a matter of course.[6]

UGAA argues that we should affirm the district court's holding as it applies to UGAA because the sexual harassment policy was not its policy and it lacks the authority to change the policy should the plaintiff prevail. We also reject this argument because it mimics the argument we just rejected. UGAA's argument is simply that Williams's amended complaint is futile, but as we stated, the district court lacked the discretion to make that determination at that time.

II.   *Whether the District Court Erred in Dismissing Williams's Title IX Claims*

Williams argues that the district court erred in dismissing her Title IX claims against UGA, the Board of Regents, and UGAA. The district court

---

[6] Rule 15(a) also provides that, except in the two circumstances in which the plaintiff may amend as a matter of course, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). This court has held that, consistent with Rule 15(a)'s mandate that "leave shall be freely given when justice so requires," district courts should generously allow amendments even when the plaintiff does not have the right to amend the complaint. *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir. 1992) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). But we have also held that "a district court may properly deny leave to amend the complaint under Rule 15(a) when such amendment would be futile." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262-63 (11th Cir. 2004) (citing *Foman*, 371 U.S. at 182). When the plaintiff has the right to file an amended complaint *as a matter of course*, however, the plain language of Rule 15(a) shows that the court lacks the discretion to reject the amended complaint based on its alleged futility.

12

concluded that Williams's claims failed because she was unable to meet the deliberate indifference requirement of the Title IX cause of action.

This case presents a factually distinct scenario from our and the Supreme Court's precedents. In each of those cases, the defendant did not learn about the alleged harasser's proclivities until the alleged harasser became a teacher or a student at the defendant's school. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) (student); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) (teacher); *Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279 (11th Cir. 2003) (student). Here, however, Williams has alleged that Adams, Dooley, and Harrick knew about Cole's past sexual misconduct when they recruited him and gained his admission to UGA. Furthermore, UGA and UGAA knew about student-athletes' suggestions that the athletic coaches should inform student-athletes about the applicable sexual harassment policy. Although, a Title IX recipient cannot be held liable for misconduct that occurred before the alleged harasser was affiliated with the recipient, as we explain later, Adams, Dooley, and Harrick's preexisting knowledge of Cole's past sexual misconduct and the student-athletes' suggestions are relevant when determining whether Williams alleged facts sufficient to survive the defendants' motion to dismiss her Title IX complaint.

Title IX states, in pertinent part: "No person . . . shall, on the basis of sex, be

13

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although Title IX does not expressly permit private enforcement suits, the Supreme Court has found an implied private right of action for individuals to enforce the mandates of Title IX. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979). The Court also has held that private individuals can obtain monetary damages. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 76 (1992).

"'[S]exual harassment' is 'discrimination' in the school context under Title IX" and in certain narrow circumstances, a plaintiff may be able to recover for student-on-student harassment. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). A plaintiff seeking recovery for a violation of Title IX based on student-on-student harassment must prove four elements. First, the defendant must be a Title IX funding recipient. *Floyd v. Waiters*, 133 F.3d 786, 789 (11th Cir.), *vacated on other grounds*, 525 U.S. 802 (1998), *reinstated*, 171 F.3d 1264 (11th Cir. 1999). Second, an "appropriate person" must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). "[A]n 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective

14

action to end the discrimination." *Id.* Third, a funding recipient is liable for student-on-student harassment only if "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis*, 526 U.S. at 633. In considering this element, we analyze the conduct of the funding recipient, not the alleged harasser; we do this to ensure that we hold the funding recipient liable only if the funding recipient's deliberate indifference "subjected" the plaintiff to discrimination. *Id.* at 640-41. Therefore, we will not hold a funding recipient liable solely because a person affiliated with the funding recipient discriminated against or harassed the plaintiff. *Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1284 (11th Cir. 2003). Fourth, the discrimination must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

A. *Title IX Claims Against the Board of Regents*

As an initial matter, we hold that the district court properly dismissed Williams's Title IX claim against the Board of Regents. Even if we construe Williams's initial complaint and first amended complaint broadly and construe all the allegations in her favor, we cannot find any allegations that an "appropriate person" with the Board of Regents had "actual knowledge of discrimination in the recipient's programs and fail[ed] adequately to respond." *Gebser*, 524 U.S. at 290.

15

Williams alleged that the Board of Regents appointed Adams and ceded substantial control over UGA to him.  Adams, however, is not a member of the Board of Regents, and Williams failed to allege that Adams has authority to take action to change the policies of the Board of Regents.  In the absence of any allegations that an appropriate person with the Board of Regents had actual knowledge of the acts that Williams alleges constitute discrimination, Williams's Title IX claim against the Board of Regents cannot survive a 12(b)(6) motion to dismiss.  *United States v. $121,100 in U.S. Currency*, 999 F.2d 1503, 1507 (11th Cir. 1993) (holding that an appeals court can affirm for any reason supported by the record, even if not relied upon by the district court).

B.  *Title IX Claims Against UGA and UGAA*

Turning to the Title IX claims against UGA and UGAA, for the reasons that follow, we hold that the district court erred in dismissing those claims.

1. *Are UGA and UGAA Title IX Funding Recipients?*

As to the first element, the parties agree that UGA is a funding recipient properly subject to Title IX liability.  Although UGAA disputes that it is a funding recipient, we believe that Williams has presented sufficient facts at this stage to show that we should treat UGAA as a funding recipient.  Here, Williams has alleged that UGA, a funding recipient, has ceded control over one of its programs,

16

the athletic department, to UGAA and provided extensive funding to UGAA. Notably, the Court has not resolved whether this is sufficient to make an entity a funding recipient subject to Title IX liability. *NCAA v. Smith*, 525 U.S. 459, 470-71 (1999); *see also Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 531 (W.D. Va. 1999). We are persuaded, however, by the analysis of the Western District of Michigan, noting that if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability. *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733-34 (W.D. Mich. 2000). We hold that Williams's complaint sufficiently alleges this element, and we leave for the discovery process and the district court to determine whether to treat UGAA like a funding recipient.

2. *Did an Appropriate Person Have Actual Knowledge of the Alleged Harassment or Discrimination?*

As to the second element, we agree with Williams that an "appropriate person" at both UGA and UGAA had actual knowledge of the harassment. According to Williams, Adams, the President of UGA and UGAA, and Dooley, the Athletic Director of UGAA, had actual knowledge of the three forms of

17

discrimination or harassment that Williams allegedly faced: (1) Cole's recruitment and admission despite his past misconduct at several other schools; (2) the January 14, 2002 incident involving Cole, Brandon Williams, and Thomas; and (3) the discrimination that Williams faced as a result of UGA's failure to respond adequately to her allegations against Cole, Brandon Williams, and Thomas. Additionally, Williams has sufficiently alleged – and Adams and Dooley do not dispute – that Adams and Dooley had authority to take corrective measures for UGA and UGAA to end the alleged discrimination. Thus, we must turn to the final two elements of a Title IX cause of action.

3. *Were UGA and UGAA Deliberately Indifferent to the Alleged Discrimination?*

The *Davis* Court held that funding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648. As the defendants note, the Court also stated that district courts can identify a funding recipient's "response as not 'clearly unreasonable' as a matter of law" and dispose of the claim on a motion to dismiss. *Id.* at 649. Nevertheless, we believe that Williams has alleged sufficient facts in her complaint to demonstrate that UGA and UGAA were deliberately indifferent to the alleged discrimination and that the

18

district court erred in concluding that the response was "not 'clearly unreasonable' as a matter of law."

The factual distinctiveness of this case is most relevant when determining whether UGA and UGAA were deliberately indifferent to the alleged discrimination. In *Gebser*, the Supreme Court adopted the deliberate indifference standard for determining when a Title IX recipient would be liable for teacher-on-student harassment, *Gebser*, 524 U.S. at 290-91, and in *Davis*, adopted the same standard for determining liability for student-on-student harassment. *Davis*, 526 U.S. at 633. Prior to *Gebser*, the Court adopted the deliberate indifference standard when determining a municipality's liability "for claims under § 1983 alleging that a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." *Gebser*, 524 U.S. at 291 (citing *Board of Comm'rs of Bryan County. v. Brown*, 520 U.S. 397 (1997); *Canton v. Harris*, 489 U.S. 378 (1989)). In adopting the deliberate indifference standard in Title IX cases that do not involve allegations of discrimination resulting from the Title IX recipient's official policy, the *Gebser* Court noted that "comparable considerations" – namely, to impose liability only for official decisions by the defendant not to remedy the violation and not for the independent actions of employees – supported the use of the deliberate indifference standard in both Title

19

IX and § 1983 municipality liability cases. *Id.* at 290-91.

In the municipality liability context, this circuit has held that a plaintiff can show deliberate indifference by proving that "the municipality knew of a need to . . . supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998). This precedent guides our decision here to the extent that we deal with a scenario that is factually distinct from *Gebser*, *Davis*, and *Hawkins*, but we stress that Title IX has important requirements for establishing deliberate indifference that cannot be scuttled simply because the plaintiff can meet the standard applicable to municipality liability cases.

First, Title IX requires that the plaintiff prove that the deliberate indifference occurred in response to discrimination she faced. *Davis*, 526 U.S. at 633. Second, as *Davis* requires, a Title IX recipient "may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. *Id.* at 644-45 (citing Random House Dictionary of the English Language 1415 (1966) (defining "subject" as "to cause to undergo the action of something specified; expose" or "to make liable or vulnerable; lay open; expose")); Webster's Third New International

20

Dictionary 2275 (1961) (defining "subject" as "to cause to undergo or submit to: make submit to a particular action or effect: EXPOSE"). Based on the *Davis* Court's language, we hold that a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination. _____

As stated earlier, Adams, Dooley, and Harrick's decision to recruit Cole and admit him through UGA's special admission process was a form of discrimination that Williams suffered. According to Williams, Adams, Dooley, and Harrick knew at that point of the need to supervise Cole for two reasons. First, UGA and UGAA officials had received suggestions from student-athletes that UGA and UGAA ensure that athletic coaches inform their athletes about the sexual harassment policy applicable to student-athletes. Second, and more importantly, Williams alleges that Adams, Harrick, and Dooley knew about Cole's past sexual misconduct. Nevertheless, even with its knowledge of the need to inform its student-athletes about the applicable sexual harassment policy and of Cole's past sexual misconduct, UGA and UGAA failed to adequately supervise Cole. Williams's allegations of UGA and UGAA's failures are sufficient at this stage to establish deliberate indifference under our municipality liability precedent. But to satisfy our Title IX precedent, Williams must go further and sufficiently allege that

21

the deliberate indifference subjected her to further discrimination.

Williams meets the Title IX standard through her allegations regarding the January 14 incident. UGA and UGAA's failure to inform its student-athletes about the applicable sexual harassment policy and failure to supervise its student-athletes subjected Williams to this further harassment and caused Williams to be the victim of a conspiracy between Cole, Brandon Williams, and Thomas to sexually assault and rape her. By placing Cole in a student dormitory and failing to supervise him in any way or to inform him of their expectations of him under the applicable sexual harassment policy, UGA and UGAA substantially increased the risk faced by female students at UGA.

Furthermore, viewing the evidence in the light most favorable to Williams, UGA acted with deliberate indifference again when it responded to the January 14 incident.[7] Although UGA Police seem to have performed a thorough investigation, UGA failed to provide an adequate response. Within forty-eight hours of the incident, UGA had a preliminary report providing details about the incident, and by April 2002, had a full report, including information about

---

[7] Although the complaint appears not to adequately allege that UGAA had any role in the discrimination Williams suffered because of the lax response to the January 14 incident, we leave for the district court to determine what role UGAA played in this form of discrimination and what role UGAA could have played in responding to the incident more effectively.

22

interviews with suspects and witnesses, from UGA Police. Nevertheless, UGA waited another eight months before conducting a disciplinary hearing to determine whether to sanction the alleged assailants. By that point, two of the alleged assailants no longer attended UGA. The fact that the disciplinary panel ultimately decided not to sanction the alleged assailants is immaterial because it fails to explain why UGA waited almost eleven months to take corrective action, especially considering the fact that UGA Police's report provided substantial evidence corroborating Williams's version of the January 14 incident. To the extent that UGA argues that it waited so long because of the pending criminal trials against the assailants, this argument also fails because: (1) the pending criminal charges did not affect UGA's ability to institute its own procedures; (2) the criminal charges were an ineffectual means to prevent future attacks at UGA while the charges were pending; and (3) the disciplinary proceedings were not instituted for another four months after Brandon Williams's acquittal and the dismissal of charges against Cole and Thomas.

Once again, UGA's deliberate indifference was followed by further discrimination, this time in the form of effectively denying Williams an opportunity to continue to attend UGA. Although Williams withdrew from UGA the day after the January 14 incident, we do not believe that at this stage her

23

withdrawal should foreclose her argument that UGA continued to subject her to discrimination. In light of the harrowing ordeal that Williams faced on January 14, her decision to withdraw from UGA was reasonable and expected. Viewing the evidence in the light most favorable to Williams, UGA failed to take any precautions that would prevent future attacks from Cole, Thomas, Brandon Williams, or like-minded hooligans should Williams have decided to return to UGA, either by, for example, removing from student housing or suspending the alleged assailants, or implementing a more protective sexual harassment policy to deal with future incidents.[8] Considering what had already occurred, UGA's failure was inexplicable and discriminatory.

Even though "[a] university might not . . . be expected to exercise the same degree of control over its students that a grade school would enjoy," *Davis*, 526 U.S. at 649, UGA and UGAA exercised almost no control over Cole, even though they knew about his past sexual misconduct. Moreover, UGA and UGAA failed to inform student-athletes about the applicable sexual harassment policy. Placed together, Williams's allegations that she faced several forms of harassment and that UGA and UGAA repeatedly responded with deliberate indifference are

---

[8] Our holding does not affect the Supreme Court's precedent that "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX." *Gebser*, 524 U.S. at 292.

sufficient to meet Williams's burden on a motion to dismiss.

4a. *Was the Discrimination Severe, Pervasive, and Objectively Offensive*?

As for the first part of the final element, we conclude that the discrimination was "severe, pervasive, and objectively offensive." *Id.* at 633. "Whether gender-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectation, and relationships,' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Id.* at 651 (citations omitted). "[T]o have a 'systemic effect' of denying the victim equal access to an educational program or activity . . . gender discrimination must be more widespread than a single instance of one-on-one peer harassment . . . ." *Hawkins*, 322 F.3d at 1289 (citing *Davis*, 526 U.S. at 652-53).

According to Williams's allegations, a conspiracy between at least two of the alleged perpetrators began before she entered Cole's room because Brandon Williams was already in Cole's closet, with Cole's permission and without her knowledge, when she entered the room. Viewing the allegations in the light most favorable to Williams, Cole and Brandon agreed before Williams arrived that Brandon would emerge from the closet and attempt to have sex with Williams once she and Cole finished having sex. Then, during Brandon's sexual assault of

25

Williams, Cole called Thomas and Charles Grant and invited them to continue "running a train" on Williams. Even though Williams successfully fended off Brandon's attempted rape, the situation worsened further when Thomas arrived and raped her. Moreover, Thomas later telephoned her twice.

The January 14 events differ markedly from the rarely actionable, theoretical single incident mentioned in *Davis* and *Hawkins*. The incident involved a ringleader who lured the victim to his territory and then conspired with two friends to commit two separate acts of sexual assault and so constitutes a continuous series of events. Although occurring in one room over two hours, the acts are sufficient to meet the requirements of severity and objective offensiveness. Based upon these facts, together with the discrimination that occurred before and after the incident, we conclude that Williams has alleged sufficient facts at this stage to show that the discrimination was pervasive.

4b. *Did the Alleged Discrimination Effectively Bar Williams's Access to an Educational Opportunity or Benefit?*

This leaves us to resolve whether the discrimination "effectively bar[red] the victim's access to an educational opportunity or benefit." *Davis,* 526 U.S. at 633. As we noted, this case involves a cycle of discrimination and deliberate indifference that lasted for more than one year, ultimately resulting in Williams's

26

withdrawal from and decision not to return to UGA. Williams alleges that she may return to the university if UGA implements more effective procedures to deal with student-on-student harassment. Although UGA and UGAA neither formally forced Williams to leave nor banned her from returning, the discrimination in which they engaged or they allowed to occur on campus caused Williams to withdraw and not return. When Williams was faced with decisions to leave or to return to UGA, she knew the following: (1) UGA and UGAA recruited and admitted a student-athlete despite knowledge of his past sexual misconduct; (2) UGA and UGAA failed to supervise dangerous students or properly instruct student-athletes on the applicable sexual harassment policy; (3) she was sexually assaulted and raped by three student-athletes, including one whose past sexual misconduct was known to UGA and UGAA officials; and (4) the response to her complaints did nothing to assuage her concerns of a future attack should she return to UGA. Considering these circumstances, we conclude that Williams has alleged sufficient facts at this stage to show that the alleged discrimination "effectively bar[red] [her] access to an educational opportunity or benefit," namely pursuing an education at UGA.

It is important to emphasize the extent and limits of our analysis. A court's holding can reach no further than the facts of the case before it. See Watts v.

27

BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); United States v. Aguillard, 217 F.3e 1319, 1321 (11th Cir. 2000) (per curiam) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." (citation and internal marks omitted).

The facts alleged in this case are extreme. According to the amended complaint, which we take as true for present purposes, UGA and UGAA officials actively recruited and admitted Cole despite his past serious sexual misconduct. Once Cole was a student-athlete at UGA and placed in a dormitory, the defendants' did not supervise or even counsel him against sexual harassment or other sexual misconduct. Even after the rape and assault, which Cole orchestrated, the defendants failed for months to remove Cole and the other attackers from the university. It is likely that this failure prevented Williams from returning to the university to continue her education.

We hold that these extreme facts are sufficient to state a claim under Title IX. We do not decide, nor could we decide, whether a valid Title IX claim would have been stated if the facts alleged had been less severe.

III.    *Whether the District Court Erred in Dismissing Williams's § 1983 Claims*

28

Next we consider Williams's § 1983 claims against Adams, Harrick, and Dooley, as individuals and in their official capacities, and against the Board of Regents and UGA. The district court dismissed the claims against Adams, Harrick, and Dooley as individuals based on Williams's failure to state a claim and the defendants' qualified immunity. The district court dismissed all other claims based on Eleventh Amendment immunity.

Title 42 U.S.C. § 1983 provides every person with the right to sue those acting under color of state law for violations of federal constitutional and statutory provisions. 42 U.S.C. § 1983. Section 1983 is merely a vehicle by which to bring these suits; it does not create any substantive federal rights. *Whiting v. Traylor*, 85 F.3d 581, 583 (11th Cir. 1996). Therefore, the plaintiff must point to a specific federal right that the defendant violated. *Id.*

Here, Williams asserts that Adams, Harrick, and Dooley, while acting under color of state law – a finding that the defendants do not dispute – deprived her of her federal rights: (1) under Title IX by failing to implement policies and procedures to ensure compliance with the statute and (2) under the Equal Protection Clause for discrimination based on sex. Williams also asserts a § 1983 claim against the three defendants because they exhibited deliberate indifference by recruiting and admitting Cole despite his troubled past. Williams fails to

explain what statutory or constitutional right the defendants violated through their deliberate indifference, so we consider those allegations as relevant to both the Title IX and equal protection claims. Additionally, Williams asserts that UGA and the Board of Regents violated the Equal Protection Clause by implementing a sexual harassment policy that treats student-on-student harassment differently from harassment involving other members of the university community.

A. *Section 1983 Claims Against Adams, Harrick, and Dooley for Violating Title IX*

The district court dismissed Williams's first § 1983 claim against Adams, Harrick, and Dooley as individuals because a plaintiff cannot assert a § 1983 action based on a violation of Title IX. We agree. Title IX does not allow claims against individual school officials; only funding recipients can be held liable for Title IX violations. *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999).[9] Although this court has never considered whether a plaintiff can use § 1983 to assert a Title IX claim against an individual school official, we conclude that to allow plaintiffs to use § 1983 in this manner would permit an end run around Title IX's explicit language limiting liability to funding recipients.

---

[9] Williams cites *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1999), to support her claim, but as the district court noted, *Seamons* actually stands for the contrary proposition. *Id.* at 1234 n.8.

B. *Section 1983 Claims Against Adams, Harrick, and Dooley for Violating*

*the Equal Protection Clause*

The district court dismissed Williams's second § 1983 claim against Adams,

Harrick, and Dooley as individuals, holding that the defendants have qualified

immunity and that Williams failed to state a claim.  We need not address whether

Williams failed to state a claim because we affirm the district court's holding on

qualified immunity grounds.

"Qualified immunity shields governmental officials executing discretionary

responsibilities from civil damages 'insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person

would have known.'"  *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir.

1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  If a defendant

asserts a qualified immunity defense in a Rule 12(b)(6) motion to dismiss, the

court should grant qualified immunity if the plaintiff's complaint fails to allege a

violation of a clearly established constitutional or statutory right.  *Williams v. Ala.*

*State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997) (per curiam).

To establish a defense of qualified immunity, the defendant must show that

he acted within the scope of discretionary authority when performing the

challenged conduct.  *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).  If the

31

defendant meets this burden, the burden shifts to the plaintiff to establish that the defendant's conduct violated clearly established law. *Id.* at 1564. The parties agree that the defendants met their burden; therefore, we turn to the dispositive inquiry.

Under the second step, the plaintiff must establish that the state of the law when the challenged events occurred was such that the defendant had fair warning that his alleged treatment of the plaintiff was unconstitutional. *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003). The plaintiff does not have to show that the precise conduct in question has been held unlawful. *Id.* Nevertheless, for a federal right to be clearly established, its parameters "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979). Here, Williams has alleged a harrowing incident, similar to other allegations that unfortunately have become increasingly common on today's university campuses.[10] Williams presents a compelling case that Adams, Harrick,

---

[10] *See, e.g.*, Diane Carman, *Finally, A Debacle CU's Barnett Can't Survive*, Denver Post, Dec. 8, 2005, at B05; *Six UTC Players Charged with Rape*, Mobile Register, Nov. 9, 2005, at C7; Simone Weichselbaum, *Athletes: Campus Life Raunchy, Raucous Partygoers, Others at La*

32

and Dooley knew about the criminal and disciplinary problems that plagued Cole's past, but that they considered his basketball skills a greater benefit than his questionable mores were a burden. Furthermore, Williams has presented evidence to show that the defendants' action, coupled with others' actions, may amount to discrimination actionable under Title IX. At a minimum, Adams, Harrick, and Dooley acted recklessly, and their apparent "win at all costs" attitude resulted in enormous costs and fewer wins than expected. Nevertheless, Williams has failed to present any cases that show the three defendants violated her clearly established equal protection rights by recruiting and admitting an individual like Cole. Therefore, Williams cannot meet her burden under the second step of the qualified immunity analysis, and we hold that Adams, Harrick, and Dooley are entitled to qualified immunity.

Williams also brings § 1983 claims against Adams, Harrick, and Dooley, in their official capacities. The district court dismissed these claims based on Eleventh Amendment immunity. Without addressing the district court's reasoning, we hold instead that the claims were properly dismissed for the same reasons we dismissed the claims against those defendants in their individual capacities. *$121,100 in U.S. Currency*, 999 F.2d at 1507 (holding that an appeals

---

*Salle Talk of Alleged Sexual Assaults*, Phila. Daily News, July 1, 2004, at 10.

33

court can affirm for any reason supported by the record, even if not relied upon by the district court).

C. *Section 1983 Claims Against UGA and the Board of Regents*

As for the § 1983 claims against UGA and the Board of Regents, we hold that the Eleventh Amendment bars suit against those defendants. Under most circumstances, the Eleventh Amendment bars suits against states and state entities by their citizens. *Hans v. Louisiana*, 134 U.S. 1, 20-21 (1890). Williams does not dispute that UGA and the Board of Regents are state entities for Eleventh Amendment purposes. But even in those situations in which the Eleventh Amendment bars suits, a party may sue the state if the state has waived its immunity or if Congress has validly abrogated the state's immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999) (abrogation); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239-40 (1985) (waiver).

Williams correctly notes that Congress validly abrogated the states' immunity from Title IX suits. *Gebser*, 524 U.S. at 284. This is why the Eleventh Amendment did not bar the direct Title IX action against UGA, UGAA, and the Board of Regents. Here, however, Williams is trying to use § 1983 to bring a Title IX claim. Congress has not abrogated states' immunity from § 1983 suits. *Miller*

34

*v. King*, 384 F.3d 1248, 1259-60 (11th Cir. 2004). Nor has UGA or the Board of Regents waived its Eleventh Amendment immunity. Therefore, the Eleventh Amendment bars Williams's § 1983 claims against UGA and the Board of Regents.[11]

IV. *Whether the District Court Erred in Dismissing Williams's Claim for Injunctive Relief*

Finally, Williams asserts that the district court erred in dismissing her claim for injunctive relief that she requested in her initial complaint and expanded upon in her first amended complaint. In her initial complaint, Williams sought an injunction "ordering the defendants to implement policies, and procedures to protect students like Plaintiff from student-on-student sexual harassment prohibited by Title IX." Although not entirely clear, this request for injunctive relief likely applies to UGA, the Board of Regents, Adams, Dooley, and UGAA. In her first amended complaint, Williams sought an injunction ordering UGA and the Board of Regents to implement sexual harassment policies providing for:

> (1) notice to students, parents of elementary and
> secondary students, and employees of the procedure,

---

[11] Although Williams's complaint does not set forth a § 1983 claim against UGAA, Williams asserts that we "must read the allegations of the complaint to include any theory on which the plaintiff may recover." *Linder v. Portocarrero*, 963 F.2d 332, 336 (11th Cir. 1992) (citation omitted). Even if we were to accede to Williams's request, we would hold that the Eleventh Amendment bars a § 1983 claim against UGAA.

35

including where the complaints may be filed; (2) application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties; (3) adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (4) designated and reasonably prompt timeframes for the major stages of the complaint process; (5) notice to the parties of the outcome of the complaint; and (6) an assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate – – as required by and in accordance with 62 Fed. Reg. 12044.

The district court rejected Williams's claims because she lacked standing.

As an irreducible minimum, Article III requires a plaintiff to meet three standing requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003). First, the plaintiff must show that she has suffered an injury-in-fact. *Lujan*, 504 U.S. at 560. The plaintiff must show that the alleged injury arises from the invasion of a legally protected interest that is sufficiently concrete and particularized, and not abstract and indefinite. *Id.* Second, the plaintiff must establish a causal connection between the asserted injury-in-fact and the challenged action of the defendant. *Id.* Third, the plaintiff must show that it is likely, rather than speculative, that a favorable decision will redress her injury. *Id.* at 561. Additionally, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief

36

only if the party alleges, and ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001) (citation omitted).

We agree with the district court's reasoning and hold that Williams lacked standing to pursue injunctive relief because the threat of future harm to Williams and other students is merely conjectural.[12] First, the alleged assailants no longer attend UGA. Therefore, as for harm that may come from them, granting injunctive relief would not prevent future harm to Williams or other students or remedy the past harm Williams suffered.

Second, Williams no longer attends UGA. Williams alleges that if UGA adopts an equal and more protective sexual harassment policy – presumably the one she asks this court to order – she may pursue undergraduate or graduate studies at UGA. Furthermore, she alleges that in the absence of such a policy, the current students at UGA who are the victims of student-on-student harassment suffer from prohibited inequality. Williams's claim that an equal and more

---

[12] To the extent that Williams's claim for injunctive relief is part of her first amended complaint, we hold that the district court properly dismissed the claim even though Williams could amend her complaint as a matter of course. The district court's decision was on a threshold matter solely for a court to decide as a matter of law; therefore, it was different from the district court's decision to deny the motion to amend because the claims for declaratory relief were futile.

protective sexual harassment policy would prevent future harm is too conjectural to warrant injunctive relief. Consequently, we affirm the district court's decision that Williams lacks standing to obtain the injunctive relief she seeks.

V.    *State Law Claims Against Cole, Brandon Williams, and Thomas*

The district court also dismissed Williams's state law claims against Cole, Brandon Williams, and Thomas, holding that because it dismissed the federal claims against the other defendants, it would exercise its discretion pursuant to 28 U.S.C. § 1367 not to assume supplemental jurisdiction over the state law claims. In her notice of appeal, Williams stated that she was appealing "the order granting the defendants' motion to dismiss and the final judgment." Additionally, she included Cole, Brandon Williams, and Thomas on the certificate of interested persons in her appellate brief, and she included Thomas's attorney on the certificates of service attached to the notice of appeal and the appellate briefs. These facts show that Williams probably intended to appeal the district court's ruling on the state law claims. Williams, however, failed to raise any arguments in her initial or reply brief addressing the district court's ruling on this issue. Therefore, even though we remand some federal claims, we will not remand to the district court to consider whether it should exercise supplemental jurisdiction over the state law claims because we conclude that Williams waived that argument by

38

failing to raise it properly on appeal.  *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

## Conclusion

In conclusion, we **REVERSE** the district court's dismissal of Williams's Title IX claims against UGA and UGAA and denial of permission to amend her complaint and **REMAND** to the district court for further proceedings consistent with this decision.  We **AFFIRM** the district court on all other rulings.

JORDAN, District Judge, specially concurring:

I concur in the judgment as to the Title IX claims against the UGA and the UGAA, and concur in the panel's opinion in all other respects. I write separately to explain why I believe Ms. Williams' Title IX claims against the UGA and the UGAA survive a motion to dismiss.

In the typical Title IX case, deliberate indifference is shown by evidence that the funding recipient, having been placed on actual notice of an act or acts of discrimination or harassment, subsequently does nothing (or virtually nothing) to stop or prevent the offending conduct. Causation is shown by evidence that, as a result of the funding recipient's deliberate indifference, the plaintiff was subjected to further acts of discrimination or harassment. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 633, 640-41, 650 (1999); *Gebser v. Lago Vista Indep. School Dist.,* 524 U.S. 274, 290 (1998). In my view, Ms. Williams' case is not the typical Title IX case.

*Gebser* and *Davis* each involved what I would call alleged "after-the-fact" deliberate indifference. The funding recipients in *Gebser* and *Davis* had no knowledge prior to the first acts of discrimination or harassment by, respectively, the teacher and the student. There was no allegation in *Gebser* that the school district hired the offending teacher knowing that he had sexually harassed or abused students in the past. Likewise, there was no allegation in *Davis* that the school district knew,

prior to admitting the offending student, or placing him in a classroom with the plaintiff, that the student had a proclivity for sexual harassment. In both cases, therefore, it made sense to require the plaintiff to show that, after receiving actual notice of the discrimination or harassment, the funding recipient did nothing (or close to nothing) to correct the problem, and that this failure led to further discrimination or harassment against the plaintiff. Otherwise, a funding recipient would essentially be facing respondeat superior liability (or maybe even strict liability) for acts of discrimination or harassment committed by others without the recipient's prior or contemporaneous knowledge.

A rule established in a prior case should not be "woodenly applied" in a later case "without any regard to . . significant differences" in the two cases. *See Codispoti v. Pennsylvania*, 418 U.S. 506, 535(1974 (Rehnquist, J., dissenting). This case is different, and significantly different, than the typical *Gebser/Davis* paradigm in which the funding recipient is oblivious to the threat of discrimination or harassment until some misconduct is committed. Ms. Williams has alleged that the UGA and the UGAA knew, before recruiting and admitting Mr. Cole, (1) that he had sexually attacked two female school employees at his community college's athletic department by groping them and putting his hands down their pants, and (2) that he had made lewd suggestions to a store clerk while attending another college. Ms. Williams has

41

also alleged that the UGA and the UGAA, with knowledge of these facts, nevertheless admitted Mr. Cole, with a full scholarship, under a special admissions program, because it was believed that he could help the basketball program. Reading the complaint in the light most favorable to Ms. Williams, the UGA and the UGAA allegedly did nothing to monitor or counsel Mr. Cole after his admission. In short, Ms. Williams has claimed that the deliberate indifference in this case preceded, and proximately caused, her sexual assault and rape. In other words, Ms. Williams has alleged "before-the-fact" deliberate indifference.

I see no reason why a funding recipient should avoid Title IX liability if, with prior knowledge of a prospective student's or teacher's documented prior acts of serious sexual misconduct, it admits the student or hires the teacher and then fails to conduct any monitoring or counseling, thereby placing other students in serious danger. In such a scenario, there should not and need not be any requirement that the victim be subjected to a second act of discrimination or harassment before there can be Title IX liability.

Assume that a university, desperate to upgrade its losing women's volleyball team, decides to hire as its new coach a man who had publicly been forced to leave his two most recent college coaching positions because of allegations that he had sexually harassed some of his female student-athletes. The university checks into the

42

coach's past – i.e., it does due diligence – and determines that the allegations against the coach were well-founded, despite his vehement denials. The university confirms, for example, that two years earlier the coach had put his hands down the shorts of two of his female players, and that this incident led to the coach's firing. Yet because of pressure from boosters, including one alumnus who says that he will withhold a substantial donation until the women's volleyball team starts winning, the university hires the coach, who has won numerous championships and has a history of turning losing programs around. The university does nothing to monitor the coach's conduct, however, and fails to provide him with any counseling. Less than a year after being hired by the university, the coach sexually assaults one of his players. In such a case, the university's calculated decision to hire the coach after looking into and verifying his checkered past, combined with its subsequent failure to conduct any monitoring or provide any counseling, would be deliberately indifferent under Title IX. *See generally Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (explaining, in Eighth Amendment context, that deliberate indifference exists when an official knows of, and disregards, an excessive risk of harm: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference").

Insofar as they concern the funding recipient's knowledge and behavior, Ms.

Williams' allegations are not too far removed from the hypothetical described above. Ms. Williams should have the opportunity to prove her allegations against the UGA and the UGAA through discovery, and if the evidence is sufficient to survive summary judgment, to present them to a jury.

Allowing Ms. Williams' Title IX claims against the UGA and the UGAA to defeat a Rule 12(b)(6) motion, moreover, would not lead to implicit adoption of a watered-down liability standard. For example, if it turns out that the UGA and the UGAA did not know about Mr. Cole's past sexual misconduct, there will be no Title IX liability, as actual notice will be lacking, and there can not be deliberate indifference without knowledge. Similarly, if it turns out that the UGA and the UGAA learned about the allegations against Mr. Cole, but investigated and found them unsubstantiated, or found them substantiated but monitored and/or counseled Mr. Cole in an attempt to prevent any similar conduct, there will be no Title IX liability, for the UGA and the UGAA will not have acted with deliberate indifference under Eleventh Circuit precedent. *See, e.g., Sauls v. Pierce County School Dist.,* 399 F.3d 1279, 1285-87 (11ᵗʰ Cir. 2005); *Davis v. DeKalb County School Dist.,* 233 F.3d 1367, 1372-75 (11ᵗʰ Cir. 2000).