FILED: August 30, 2021

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 19-2203
(1:18-cv-00614-LO-MSN)
_____

JANE DOE,

        Plaintiff – Appellant,

v.

FAIRFAX COUNTY SCHOOL BOARD,

        Defendant – Appellee.

------------------------------

NATIONAL WOMEN'S LAW CENTER; CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION; CLEARINGHOUSE ON WOMEN'S ISSUES; DESIREE ALLIANCE; FEMINIST MAJORITY FOUNDATION; FORGE, INCORPORATED; GENDER JUSTICE; GIRLS INC.; HUMAN RIGHTS CAMPAIGN; IN OUR OWN VOICE: NATIONAL BLACK WOMEN'S REPRODUCTIVE JUSTICE AGENDA; KWH LAW CENTER FOR SOCIAL JUSTICE AND CHANGE; LEGAL AID AT WORK; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; NATIONAL ASSOCIATION OF SOCIAL WORKERS, and its Virginia Chapter; NATIONAL CRITTENTON; NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; NATIONAL WOMEN'S POLITICAL CAUCUS; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; STOP SEXUAL ASSAULT IN SCHOOLS; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; TRANSGENDER LAW CENTER; WOMEN LAWYERS ASSOCIATION OF LOS ANGELES; WOMEN LAWYERS ON GUARD INC.; WOMEN'S BAR ASSOCIATION OF THE STATE OF NEW YORK; WOMEN'S LAW PROJECT,

        Amici Supporting Appellant.

NATIONAL SCHOOL BOARDS ASSOCIATION; VIRGINIA SCHOOL BOARDS ASSOCIATION; MARYLAND ASSOCIATION OF BOARDS OF EDUCATION; NORTH CAROLINA SCHOOL BOARDS ASSOCIATION; SOUTH CAROLINA SCHOOL BOARD ASSOCIATION,

Amici Supporting Appellee.

———————————

O R D E R

———————————

The court denies the petition for rehearing en banc.

A requested poll of the court failed to produce a majority of judges in regular active service and not disqualified who voted in favor of rehearing en banc. Judge Wilkinson, Judge Niemeyer, Judge Agee, Judge Quattlebaum, Judge Richardson, and Judge Rushing voted to grant rehearing en banc. Chief Judge Gregory, Judge Motz, Judge King, Judge Keenan, Judge Wynn, Judge Diaz, Judge Floyd, Judge Thacker, and Judge Harris voted to deny rehearing en banc.

Entered at the direction of Judge Wynn.

For the Court

/s/ Patricia S. Connor, Clerk

2

WYNN, Circuit Judge, concurring in the denial of rehearing en banc:

Because this Court denies the petition for rehearing en banc, this matter is decided by the opinions produced by the three-judge panel that fully considered the issues after oral argument. Yet now, we confront two advisory opinions that purport to dissent from the denial of the petition to rehear this matter en banc. But those opinions provide next to no explanation for why our colleagues are dissenting from the denial of rehearing en banc, a procedural question falling under Federal Rule of Appellate Procedure 35(a). Instead, both opinions focus entirely on the underlying merits, and thus are no more than advisory opinions that read like editorials or legal commentary on the three-judge panel decision.

This is not a new practice, though until recently, it was uncommon in our circuit. *See Cannon v. Kroger Co.*, 837 F.2d 660, 660 (4th Cir. 1988) (Murnaghan, J., dissenting from the denial of rehearing en banc) (noting that, as of the late 1980s, this practice was "unusual, if not extraordinary" in the Fourth Circuit). For decades in other circuits, both panel and non-panel members have issued merits opinions dissenting from the denial of rehearing en banc. *E.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 228 F.3d 998, 999 (9th Cir. 2000) (Kozinski, J., dissenting from the denial of rehearing en banc in a case where he did not sit on the panel). "Since the first [dissent from a denial of rehearing en banc] in 1943, appellate judges have employed them with increasing regularity," and the practice particularly picked up steam after the turn of the century. Jeremy D. Horowitz, *Not Taking "No" for an Answer: An Empirical Assessment of*

3

*Dissents from Denial of Rehearing En Banc*, 102 Geo. L.J. 59, 60 (2013). The vast majority of these dissents are written by judges other than the panel dissenter.[1] *Id.* at 74.

To be sure, the proliferation of dissents from the denial of rehearing en banc has "sparked heated debate among academics and judges alike." *Id.* at 61. Some have justified this practice by noting that "there has been some indication from members of the Supreme Court that they find [such] dissents useful in deciding whether to take cases on certiorari," and that the dissents "inform the Supreme Court of the importance of an issue and of arguments favoring one side or the other that have not theretofore appeared in print." Marsha S. Berzon, *Introduction*, 41 Golden Gate U. L. Rev. 287, 293 (2011); *see also* Indraneel Sur, *How Far Do Voices Carry: Dissents from Denial of Rehearing En Banc*, 2006 Wis. L. Rev. 1315, 1353 (2006) ("A crisp rehearing dissent may help a losing party at the panel level write an analytically powerful petition for certiorari. That may be why the Solicitor General of the United States and private litigants quote from rehearing dissents when petitioning or fending off arguments in opposition to a petition." (footnotes omitted)). "[C]ircuit judges elsewhere in the nation also take heed of rehearing dissents in various degrees," and there are even "instances of congressional reports citing" them. Sur, *supra*, at 1354, 1356.

---

[1] Interestingly, by tradition in the Ninth Circuit, the panel dissenter is not usually the judge to call for an en banc poll. Marsha S. Berzon, *Introduction*, 41 Golden Gate U. L. Rev. 287, 290 (2011). In this case, the advisory opinions appended below include opinions from both the panel dissenter who initiated the poll (Judge Niemeyer) and a non-panel member (Judge Wilkinson). I refer to Judge Wilkinson's opinion as the "first" dissenting opinion and Judge Niemeyer's opinion as the "second" dissenting opinion.

But these dissents also come with serious drawbacks. They have been characterized as reading, "inappropriately, like petitions for writs of certiorari," providing one judge's blueprint for how the favored party ought to frame the case before the Supreme Court. Berzon, *supra*, at 294. Some have observed that these advisory opinions involve circuit judges engaging in "advocacy for further review [that] is inappropriate" and comes at the cost of not "upholding [the Court's] decision-making processes once they are completed." *Id.*; *see also Indep. Ins. Agents of Am., Inc. v. Clarke*, 965 F.2d 1077, 1080 (D.C. Cir. 1992) (Randolph, J., separate opinion) (arguing that it is "inappropriate" for judges to use dissents from denials of rehearing en banc to "step[] out of the robe and into the role of an advocate" and that these dissents "rub[] against the grain of Article III's ban on advisory opinions"); Michael E. Solimine, *Due Process and En Banc Decisionmaking*, 48 Ariz. L. Rev. 325, 328 (2006) (quoting Judge J. Clifford Wallace as stating that he does not read dissents from denials of en banc review because "[t]hey express a dissent from a non-opinion of the court" and are akin to "editorials after the court has ruled"); *cf.* Berzon, *supra*, at 294 (noting that some have argued that dissents from denials of rehearing en banc waste judicial resources on nonprecedential opinions falling outside the traditional three-judge-panel-or-en-banc-review dichotomy). To the extent some "members of the Supreme Court" have indicated "they find the[se] dissents useful in deciding whether to take cases on certiorari," Berzon, *supra*, at 293, this appears to extend an invitation for individual judges to freely submit advisory opinions to the Supreme Court.

There is also a belief that such dissents may harm the public image of the judiciary. Some commentators suggest that these opinions can create an "overblown appearance of internal dissension and disarray," *id.* at 294, while also "heighten[ing] the degree to which politics overtly governs judicial activity" by "imply[ing] an ideological preference so strong that it compels a judge to interpose herself in a dispute in which she has not been called to participate," Horowitz, *supra*, at 85–86; *see also id.* at 83 (noting that "[t]he Supreme Court grants review in cases with [dissents from denial of rehearing en banc] by Republican affiliates roughly 35% of the time, compared to a Democratic affiliate success rate of only 17%").

In particular, there has been criticism that a dissent by a non-panel member that addresses the merits may signal to the public disrespect for the hard work of the panel and for the full court's decision not to take a case en banc, even though en banc review "is not favored" by Rule 35(a). *See* Horowitz, *supra*, at 68 ("Readers of the Federal Reporter are left with the impression of . . . an opinion entitled to less deference than that which would ordinarily be accorded to circuit precedent."). And "[w]hen the rehearing dissenter was not on the panel, . . . the judge has not ordinarily read the entire record, participated in oral argument, or discussed the case in conference with other judges." Sur, *supra*, at 1344–45. This may "call into question the value of the judicial process as a whole" because "[i]f a judge who did not read the parties' briefs or hear their oral arguments nevertheless feels free to give her opinion on the merits of the case . . . [,] one might reasonably wonder

6

whether the judicial system places too much emphasis on briefing and oral argument." Horowitz, *supra*, at 87.

Whatever the value or cost of these advisory opinions, as a Court, we ought to acknowledge and be transparent about what this practice entails. In our circuit, any active judge may call for an en banc poll, "with or without a petition" filed by a party. 4th Cir. R. 35(b). That means that this practice permits non-panel members to issue advisory opinions on *any* point of disagreement they have with the merits of *any* opinion issued by *any* panel, simply by calling for a poll and, if it is denied, appending a dissent.

Rule 35, as presently written, does not explicitly describe such a process. But given that our circuit has begun to embrace this practice, I believe we should modify Rule 35 to make explicit that individual judges may submit advisory opinions attached to the denial of rehearing en banc. And in doing so, the rule should reflect that these types of opinions neither supplement the panel decisional opinions nor "constitute the law of the circuit." Horowitz, *supra*, at 92.

Having expressed these considerations in the interest of the transparency that is so vital to our role as judges and of providing some notice of the real purpose of these types of opinions, I acknowledge again that this practice appears to have secured a foothold in our circuit. Accordingly, I offer the following equally advisory opinion to respond to the two advisory opinions in dissent of this court's decision to deny rehearing en banc.[2]

---

[2] Our first dissenting colleague refers to my "reservations" about dissents from the denial of rehearing en banc. Wilkinson Dissenting Op. at 19. My colleague is mistaken. I merely have endeavored to gather commentary from judges and legal scholars describing

7

\* \* \*

Today, our Court properly denies the petition for rehearing en banc in this case. In doing so, we recognize that (1) an education free of discrimination on the basis of sex is undoubtedly an important right of all students, and (2) consistent with the statutory text and applicable case law, the panel majority opinion adequately safeguards that right. In short, the panel majority opinion concluded that no evidence in the record supported the jury's verdict under the correct actual-knowledge legal standard, so the panel reversed and remanded for a new trial. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263 (4th Cir. 2021). The panel majority opinion also considered, and rejected, the School Board's argument for affirmance on an alternative ground: that no reasonable jury could find that the School Board acted with deliberate indifference. *Id.* at 271.

Now, based on a single paragraph in the School Board's petition for rehearing that advances a new argument, our first colleague in dissent from the denial of rehearing en banc advises that this Court should grant en banc review of an issue that was not presented to the district court at trial and not presented subsequently to the panel on appeal. In that single paragraph, the School Board argues that because Spending Clause legislation must be clear about potential liabilities, the School Board cannot be held liable under the deliberate-indifference prong because Title IX does not make clear that schools may be

---

the costs and benefits of these dissents and to provide some suggestions as to how we might make their usage more transparent going forward. I also note that nothing my good colleague has said changes the fact that these are advisory opinions.

held liable for their response to a single instance of sexual harassment, no matter how egregious. And though that argument is at odds with the School Board's position at oral argument and is raised only in passing in its petition for rehearing, our first colleague in dissent believes that it meets the criteria under Federal Rule of Appellate Procedure 35(a) for granting rehearing en banc. *See* Wilkinson Dissenting Op. It surely does not. But even if it did, the plain text of Title IX supports the panel majority's ruling in this matter.

This case involves a sexual assault that a jury found took place on a school bus during a band trip. *Doe*, 1 F.4th at 261, 263. The plaintiff, "Jane Doe," sat next to "Jack Smith," an older student. Doe alleges that Smith repeatedly touched her breasts and genitals and penetrated her vagina with his fingers despite her efforts to physically block him, and that he also repeatedly put her hand on his penis even after she moved it away. She testified at trial that during this incident, she felt so "confused," "shocked," and "scared" that she was "frozen in fear the whole time." *Id.* at 261.

Doe, her friends, and her parents repeatedly reported the incident to the school. *Id.* at 261–62. Yet a reasonable jury could conclude that these reports were met with deliberate indifference. To summarize just a few pieces of evidence the jury could view in Doe's favor: school officials took no action to protect Doe or to offer emotional support to her during the five-day band trip; instead, the principal made an inappropriate joke about the incident in an email; after the band trip, the school's Safety and Security Specialist asked victim-blaming questions such as what Doe was wearing and why she did not scream; and

school officials discussed with Doe (but not with Smith!) the possibility of being disciplined for engaging in sexual activity on a school trip. *Id.* at 271–72.

The jury found that Smith sexually harassed Doe and that the harassment was severe, pervasive, and offensive enough to deprive Doe of equal access to the educational opportunities or benefits provided by her school. But, applying the incorrect legal standard, the jury found that the school lacked actual knowledge of the harassment. Because of this, the jury did not reach the question of whether the school had responded to the harassment with deliberate indifference. The panel majority reversed and remanded this matter for a new trial based on the plain language of Title IX and applicable case law.

The panel majority also rejected the arguments raised by the dissent and repeated here by our second colleague in dissent from the denial of rehearing en banc. *See id.* at 273–74, 277 n.16. For example, the panel majority rejected the notion that its holding was "based essentially on the school's refusal to discipline the male student." Niemeyer Dissenting Op. at 35; *see Doe*, 1 F.4th at 277 n.16. A school's decision about whether or not to discipline a harassing student may form part of the deliberate-indifference inquiry, but it is not, on its own, dispositive. Rather, it is a fact for the jury to weigh in the first instance.

Our first dissenting colleague advises that he would affirm on the alternative ground that Doe cannot hold the school liable for its response to what he terms "a single isolated incident of pre-notice sexual harassment" because Title IX "does not begin to . . . unambiguously" provide for such liability, no matter how severe the incident or how

10

ludicrous the school's response. Wilkinson Dissenting Op. at 18. That is wrong. *E.g.*, *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1098–1104 (10th Cir. 2019) (rejecting university's argument that a plaintiff's lawsuit must be dismissed because, while she was raped several times by two male students at a fraternity event in front of other students who filmed one of the attacks, suffered severe psychological effects that caused her grades to "plummet[]" and her to lose her academic scholarship, and was not assisted by the school in bringing the men to justice, she was not raped *again* after notifying the school of the initial incidents).

In crafting his erroneous interpretation of the statute, our first dissenting colleague creatively argues that "[t]he concurrence *suggests* that liability can be retroactively imposed [against the school] for the initial assault." Wilkinson Dissenting Op. at 21 (emphasis added). But he battles a strawman. No one "suggests," much less contends, that a school can face "retroactive" liability for the *assault itself* when the assault was committed by another student and the school had no prior warning it would occur. *Id.* at 21–22.

Nor may a school be held liable "when it hasn't a clue" about the harassment. *Id.* at 22. The school's actual notice or knowledge is an element of a Title IX claim based on student-on-student sexual harassment. *Doe*, 1 F.4th at 263–64. For a claim like the one at hand, where liability is premised on the school's after-notice response to a pre-notice instance of peer-on-peer harassment, the school is liable only for its decisions after it, indeed, has "a clue." Wilkinson Dissenting Op. at 22.

11

That is, as Doe's counsel noted at oral argument and as the panel majority opinion explained, a school may be held liable for its *own* behavior in *response* to a peer assault. *See Doe*, 1 F.4th at 263 (noting that Doe's lawsuit was premised on the assertion "that her school had acted with deliberate indifference to reports of her sexual assault"); *id.* at 266 (one of the necessary questions in Title IX cases involving student-on-student harassment is "whether [the] petitioner can show that the Board's response to reports of [the harasser's] misconduct was clearly unreasonable" (emphasis omitted) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999))); Oral Arg. at 11:35–45 (Doe's counsel noting that "[t]he injury in question in a Title IX suit is an educational deprivation . . . [,] not the sexual assault itself"); *see also Davis*, 526 U.S. at 642 ("*Pennhurst* does not bar a private damages action under Title IX where the *funding recipient engages in intentional conduct* that violates the clear terms of the statute." (emphasis added)); Department of Justice Statement of Interest at 4, *Thomas v. Bd. of Regents of the Univ. of Neb.*, No. 4:20-cv-03081-RFR-SMB (D. Neb. June 11, 2021) ("Post-assault claims, like the claim in *Davis*, focus on how a [federal funding] recipient responded *after* it received actual notice of a plaintiff's sexual harassment.").

Thus, there is no problem of retroactivity here. Nor do schools face "strict liability" for the actions of their students. Niemeyer Dissenting Op. at 35. Rather, the key question in cases like this one is whether the school discriminated against the harassed student in how it handled the student's report of peer harassment or assault. So in response to our colleague's concerns about the source of the elements of the cause of action at issue in this

12

case, Wilkinson Dissenting Op. at 22, that cause of action arises under Title IX itself. Title IX provides that "*[n]o person* in the United States *shall*, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or *be subjected to discrimination* under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphases added). Surely a student is subjected to discrimination on the basis of sex when they report a sexual assault by a fellow student on school property and are met with nothing more than a collective shrug of the shoulders—or, worse still, with accusatory questions or flat-out blame.

Indeed, the Supreme Court has explained that an educational institution can be held liable under Title IX not only where its deliberate indifference "cause[s] [students] to undergo harassment," *but also where such indifference "make[s] them liable or vulnerable" to harassment. Davis*, 526 U.S. at 645 (emphasis added) (internal quotation marks omitted). This was no idle language. Nor was it pulled from thin air. *Davis* explicitly grounded this interpretation in the statutory text.

The statute refers to students who are "*subjected* to discrimination." 20 U.S.C. § 1681(a) (emphasis added). *Davis* noted that one dictionary definition of "subject" was "to make liable or vulnerable; lay open; expose." *Davis*, 526 U.S. at 645 (quoting Random House Dictionary of the English Language 1415 (1966)). And common sense tells us that a student can be made *vulnerable* to further harassment after an initial incident without actually *undergoing* additional harassment. *See, e.g.*, *Vulnerable*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/vulnerable (last visited Aug. 27, 2021)

13

(defining "vulnerable" in part as "*capable* of being physically or emotionally wounded" (emphasis added)).

Thus, the statute itself makes plain that a school may be held liable when it makes a student vulnerable to sexual harassment by their peers, such as by failing to respond appropriately after learning of an initial incident of sexual assault. In other words, schools do not get "one free rape." Department of Justice Statement of Interest at 12 n.5 (quoting *Spencer v. Univ. of N.M. Bd. of Regents*, No. 15-CV-141-MCA-SCY, 2016 WL 10592223, at *6 (D.N.M. Jan. 11, 2016)). To hold otherwise would be "inconsistent with Title IX's goals, misinterpret[] *Davis*, and lead[] to the absurd result of requiring students to be sexually harassed or assaulted at least *twice* before a school can be held liable in damages for its deliberate indifference to known harassment," an outcome that "cannot be squared with Title IX's text and goal." *Id.*

That's why the Department of Justice, Department of Education, and several of our sister circuits have correctly concluded that a single, severe instance of peer-on-peer harassment can lead to liability for the school where the school's response (or lack thereof) leaves the victim vulnerable to additional harassment.[3] Indeed, the School Board itself

---

[3] *See* Department of Justice Statement of Interest at 13 & n.6 (noting that it is a "well-established interpretation of Title IX" that "a single instance of rape or sexual assault can have an effect so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit"); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30036 (May 19, 2020) ("[S]exual harassment includes a single instance of sexual assault . . . . [This definition] is consistent with the Supreme Court's observation in *Davis* that a single instance of sufficiently severe harassment on the basis of sex *may* have the systemic effect of denying the victim equal access to an education

14

recognized at oral argument that a plaintiff need not be harassed *again after* an initial report in order to pursue a Title IX claim. Oral Arg. at 26:40–28:05.

Our second dissenting colleague advises us that schools getting a "free rape" would not be the consequence of his restrictive interpretation of Title IX. Niemeyer Dissenting Op. at 34. Yet, in the same breath, he bases his analysis on the view that Smith's assault of Doe "was a single, isolated act of student-on-student sexual harassment, about which the school had no prior notice and which did not indicate anything systemic," noting that "similar conduct was never repeated." *Id.* at 35. I am heartened by his caveat, "*which did not indicate anything systemic.*" Of course, that is a question for the jury. But more importantly, a school's insufficient response to a single incident may make students "liable or vulnerable" to further harassment. *Davis*, 526 U.S. at 645. To not recognize that fact by

---

program or activity."); *Farmer*, 918 F.3d at 1104 ("Once a funding recipient . . . has actual knowledge of sexual harassment that is severe, pervasive and objectively offensive enough to deprive a student of access to the educational benefits and resources the recipient offers, the recipient cannot, acting with deliberate indifference, turn a blind eye to that harassment. . . . We conclude, then, that Plaintiffs can state a viable Title IX claim for student-on-student harassment by alleging that the funding recipient's deliberate indifference caused them to be 'vulnerable to' further harassment without requiring an allegation of subsequent actual sexual harassment." (footnote and citation omitted)); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007) ("[A] single instance of peer-on-peer harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity."), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009); *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1288 & n.3, 1295–97 (11th Cir. 2007) (school acted with deliberate indifference *both* before *and* after the gang rape of the victim).

allowing students to hold such schools accountable is to give schools a "free rape," something Title IX surely does not contemplate.

Importantly, the panel majority did not actually *find* that the school acted with deliberate indifference here. Instead, the majority opinion merely concluded that a reasonable jury *could* find such indifference and remanded for jurors to have the opportunity to address that question in the first instance. This amounts to what is really (or ought to be) an unremarkable holding: when a student experiences sexual assault at the hands of a peer on a school bus—an assault that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school—and reports it to their school, their school must not respond with indifference, so as to leave the student vulnerable to further attacks. But, of course, liability will only attach in those (hopefully) rare cases in which a school is actually deliberately indifferent—a "high bar" for any plaintiff to satisfy. *Doe*, 1 F.4th at 268.

Thus, contrary to the advice of our first colleague in dissent, there is no "[l]iability through ambush" here; nor does the liability imposed by the statute lack a "limiting principle." Wilkinson Dissenting Op. at 22, 31. Schools know and accept that they must not discriminate on the basis of sex. That includes deliberate indifference that leaves students vulnerable to sexual harassment by their peers. *Davis*, 526 U.S. at 645. Indeed, "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents." *Id.* at 643. So, if a school responds to a reported sexual assault in an

inappropriate manner, it can be held liable for "its *own* decision to remain idle in the face of known student-on-student harassment in its school"—that is, for subjecting one of the students in its care to discrimination on the basis of sex.[4] *Id.* at 641.

In sum, I respond to the two advisory opinions of my good colleagues with this equally advisory opinion stating that Rule 35 provides no basis for granting rehearing en banc in this case. That ends the matter. But to be sure, the decision of the panel majority is supported by Title IX and the applicable case law.

---

[4] And of course, whether liability *imposed by a statute* contains a judicially acceptable "limiting principle" is not our concern. Our first friend in dissent expresses numerous policy reservations with Congress's decision to intrude on what are, in his view, "[m]atters that can be left to state law or to the many avenues of community correction." Wilkinson Dissenting Op. at 22. But such policy decisions—including how "loose" the "net" of federal liability may be, *id.*,—are matters for Congress, not this Court. And Congress has deemed discrimination against students on the basis of sex to be worthy of federal intervention. 20 U.S.C. § 1681(a).

Further, even accepting our first dissenting colleague's invitation to consider policy to the exclusion of law, it should be noted that in the circuits that align with the majority opinion's view, no such evils of over-litigation have occurred.

WILKINSON, Circuit Judge, dissenting from the denial of rehearing en banc:

State sovereignty is not impregnable. But neither may it be lightly and casually breached. That has happened here, and it will only further contribute to the dramatic loss of control that states and localities are able to exercise over their own school systems.[1]

In *South Dakota v. Dole*, 483 U.S. 203 (1987), the Supreme Court specified that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" 483 U.S. at 207 (alterations adopted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Title IX cannot be read to impose liability on local school systems for a single isolated incident of pre-notice sexual harassment in schools, because that condition of Title IX does not begin to flow unambiguously from the text of the statute.

The creation of this novel implied private right of action against school districts surely presents a question of "exceptional" importance. *See* Fed. R. App. P. 35. But the majority says nay. How wrong it is. To subject school districts to liability for incidents they did not cause and could not prevent or foresee is a startling expansion of a statute which gave no notice to unsuspecting funding recipients that any such cause of action lay in wait.

---

[1] While I find myself in agreement with Judge Niemeyer's fine panel dissent on this issue, s*ee Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 277 (4th Cir. 2021) (Niemeyer, J., dissenting), I thank both Judge Wynn and Judge Niemeyer for their thorough discussion of this question. I hope each of their opinions will assist the Supreme Court when it ultimately resolves an issue of great importance to school districts across our country.

A brief response to my colleague's reservations about dissents from the denial of rehearing en banc. The call for a poll was before the court. Judges vote on that poll, and judges are entitled to explain their reasons for that vote. Giving reasons is what we do. Reasoning adds to judicial transparency; it does not detract from it. And debate on issues of legal and public importance is to be welcomed, not disapproved.

I agree that dissents from the denial of rehearing en banc should not be routine. But this is no routine issue. It concerns the standards for school board liability for unforeseeable incidents of student sexual misconduct in schools across our circuit, indeed if not our country. And on this and similarly crucial issues, is discussion to be arbitrarily curtailed? On many occasions, the absence of a dissent from denial would leave only one side of an issue expressed. That hardly comports with the First Amendment, whose letter and spirit we are sworn to uphold. We are better off having this debate than not having it. We are better off for the able expression of my dear friend's view, contrary as it is to Judge Niemeyer's firm convictions and my own.

I.

Because Title IX was "enacted pursuant to Congress' authority under the Spending Clause," it is interpreted like a "contract." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (citing *Pennhurst*, 451 U.S. at 17, 24–25); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998); *Barnes v. Gorman*, 536 U.S. 181, 185–86 (2002) (Title VI). Congress must thus "speak with a clear voice" to attach conditions to Title IX funding. *Davis*, 526 U.S. at 640 (quoting *Pennhurst*, 451 U.S. at 17). The "central concern" "is with ensuring that the receiving entity of federal funds [has] notice that it will

be liable for a monetary award." *Gebser*, 524 U.S. at 287 (quotations omitted). Thus, under *Pennhurst*, "private damages actions [for Title IX] are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640.

Under the Title IX "contract," a state receives federal education funds under the condition that "no person" may "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in its programs "on the basis of sex." 20 U.S.C. § 1681(a). The Supreme Court has provided some clarification of that general condition, holding that a public school can be held liable for student-on-student harassment if the school has "actual knowledge" (i.e., notice) of harassment and its deliberate indifference to the knowledge "was the cause" (i.e., failed to end or prevent) the harassment. *Gebser*, 524 U.S. at 290-91; *see also Davis*, 526 U.S. at 643 ("[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it." (quotations omitted)).

The question before this court is whether a school board can be held liable under Title IX when it received notice of a single incident of peer-on-peer sexual harassment *after* the harassment occurred. The panel majority held that it could, since "a school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge" for a school to be liable under Title IX—even if that report came *after* a single instance of sexual assault. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263 (4th Cir. 2021). The panel majority thus imposed the prospect of liability on the

20

School Board due to harassment that occurred without any warning signs and which the School Board had no means of preventing.

Because Title IX does not unambiguously impose liability for a single instance of pre-notice sexual harassment, *Pennhurst*'s canon of statutory interpretation precludes holding the School Board liable. *See Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 629 (6th Cir. 2019) (Thapar, J., concurring) (arguing that *Pennhurst* requires adopting "the less expansive reading" of ambiguous provisions of Title IX), *cert. denied*, 141 S. Ct. 554 (2020). The *Pennhurst* "canon applies with greatest force" here, since "a State's potential obligations under the Act are largely indeterminate"—meaning it "is difficult to know what is meant by" the statutory provisions and "it is unlikely that a State would have accepted federal funds had it known it would be bound" to a given interpretation of that provision. *See Pennhurst*, 451 U.S. at 24–25. It is unlikely that by agreeing to prevent "discrimination," "exclu[sion]," and "deni[al of] benefits" "on the basis of sex," 20 U.S.C. § 1681(a), a school would be aware of the condition that it would be held liable for unpredictable, unpreventable sexual assaults between students. *See Pennhurst*, 451 U.S. at 17; *see also Gebser*, 524 U.S. at 275–76 ("It is sensible to assume that Congress did not envision a recipient's liability in damages where the recipient was unaware of the discrimination."); *id.* at 288 ("When the school board accepted federal funds, it agreed not to discriminate on the basis of sex. We think it unlikely that it further agreed to suffer liability whenever its employees discriminate on the basis of sex." (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 654 (5th Cir. 1997))).

21

Just how far the concurrence is willing to go is striking. The concurrence suggests that liability can be retroactively imposed for the initial assault based solely on the School Board's asserted behavior after the fact. *See* Concurring Op. at 8–14. And where in the world the concurrence came up with the elements of this retroactive cause of action is a mystery to me. Not from the statute certainly, whose general language does not delineate anything close to the cause of action the concurrence has created. *See* 20 U.S.C § 1681(a).

For how can the state "discriminat[e]" or "exclude[]" anyone when it hasn't a clue? *See id.* Its disclaimers notwithstanding, the concurrence is moving the statute in the direction of respondeat superior, or eventually to strict liability if its theory of the instant case is now to be adopted. To contend that liability in this case is all about the response and not about the incident itself is not only to blink the whole reality of it, but to ignore the absence of any statutory language referencing an institution's response or speaking in the remedial terms that the concurrence desires.

I can discern no limiting principle to what my friend in concurrence proposes. So loose is his net that even unexpressed conditions on state governments will have no trouble slipping through. From now on, every peer-on-peer incident of which a school board received no notice will be open to a "response suit" designed to probe its aftermath. To be sure, the concurrence tries to cabin its position with adjectives such as "egregious," "severe," "offensive," and "ludicrous." Concurring Op. at 6–8, 12–14. But to a host of eager federal litigants these fuzzy standards will pose no impediment at all. Matters that can be left to state law or to the many avenues of community correction will now form the basis of federal litigation. This view is starkly at odds with the efforts of circuits that have

tried to place some outer limit on the litigative potential of the myriad individual incidents that take place in the nation's school systems almost every day. It is a familiar progression that a case whose facts are undeniably odious brings in its wake a deluge of other lawsuits even the most frivolous of which will tie up state resources and undermine state and local responsibilities at an ever accelerating pace.

## II.

*Pennhurst* stands for a general canon of statutory interpretation: ambiguous conditions in federal spending programs impacting areas integral to state sovereignty must be interpreted in favor of the state. This interpretive rule applies when two crucial criteria are met. First, it only applies when the statute is ambiguous (i.e., it does not clearly impose liability on the state). *See Salinas v. United States*, 522 U.S. 52, 60 (1997). A statute is unambiguous when "Congress spoke so clearly that [a court] can fairly say that the State could make an informed choice" as to whether or not to enter into the contract. *Pennhurst*, 451 U.S. at 25. Second, it is only invoked when fundamental principles of federalism are at stake, for *Pennhurst*'s clear statement rule "is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012); *see also Gregory v. Ashcroft*, 501 U.S. 452 (1991). Both criteria are plainly present here.

## A.

## Ambiguity

Title IX is highly ambiguous about whether states can be held liable for "a single, isolated incident of pre-notice harassment." *See Doe*, 1 F.4th at 273 n.12 (noting a sharp

23

circuit split on this very issue). It bears repeating how general and broad the plain text of Title IX is: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Of course it is unrealistic to expect Congress to anticipate every possible case or controversy under the statute that might someday arise. But Congress must be clear. The language here "does not even hint" that a school could be held liable for peer-on-peer harassment about which it was only notified after-the-fact. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006). The panel's contrary ruling blindsides the school district, which never received "clear notice" of any such liability. *See id.* at 296. The only "notice" that the School Board is receiving of liability is from the court. The School Board was entitled to receive forewarning from Congress, not a post hoc holding from this circuit. To hold otherwise stands *Pennhurst* on its head.

Supreme Court precedent interpreting Title IX casts further doubt that the statute establishes this liability. In *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), the Court explained that "*Pennhurst* does not preclude private suits [under Title IX] for *intentional* acts that clearly violate Title IX," especially where those intentional actions had been prohibited by "regulations implementing Title IX . . . on the books for nearly 30 years." *See id.* at 182–83 (emphasis added). In *Davis*, the Court similarly acknowledged that schools can be held liable under Title IX for their own intentional misconduct, but found it "unlikely" that Congress wanted to impose liability for "a single instance of sufficiently severe one-on-one peer harassment." 526 U.S. at 652–53. In view of those

precedents, I do not see "how it can be said that [Title IX] gives a State unambiguous notice regarding liability" for a single, isolated incident of pre-notice peer-on-peer harassment. *See Murphy*, 548 U.S. at 300-01.

That Title IX is ambiguous on this front is evidenced by the circuit split on this very issue. Seven circuits have addressed "the issue of whether a single, isolated incident of pre-notice harassment may be sufficient to trigger Title IX liability." *Doe*, 1 F.4th at 273 n.12. The First, Eleventh, and now the Fourth Circuit have held that "a single instance of pre-notice, student-on-student harassment could 'form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity.'" *Id.* at 273–74 (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172–73 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009)); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007). On the other hand, the Sixth, Eighth, Ninth, and Tenth Circuits have held that post-notice harassment is required for a school to be held liable. *See Kollaritsch*, 944 F.3d at 620–23 & n.3; *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1155–56 (10th Cir. 2006); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). The very fact that circuit courts are so deeply split on whether Title IX and Supreme Court precedent can be read to impose liability in these circumstances proves that this alleged condition on Title IX funding was not clearly and unambiguously stated.

25

B.

Federalism

"[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory*, 501 U.S. at 460–61 (alteration in original) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). This clear statement rule "is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 461.

Elementary and secondary education has long been recognized as integral to state sovereignty and worthy of protection in the face of federal overreach. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 564 (1995) ("[E]ducation [is an area] where States historically have been sovereign."); *Ambach v. Norwick*, 441 U.S. 68, 76 (1979) ("Public education, like the police function, 'fulfills a most fundamental obligation of government to its constituency.'" (quoting *Foley v. Connelie*, 435 U.S. 291, 297 (1978))); *Milliken v. Bradley*, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (calling education one of the most important services performed by a state); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State.").

As federal funding programs have proliferated, that traditional state function has come under threat. It is worth considering the full dimensions of the threat in brief detail,

as it bears directly on the second prong of the *Pennhurst* analysis. Though federal funds only make up about 8 percent of overall education spending, *see* Nat'l Ctr. Educ. Stats., Digest of Education Statistics, tbl. 235.10, the rules governing how those funds can be spent "strongly influence local decisions about student services," Melissa Junge & Sheara Krvaric, How Confusion over Federal Rules Can Get in the Way of Smart School Spending, Am. Enter. Inst. 1 (Dec. 2019), https://www.aei.org/wp-content/uploads/2019/11/How-Confusion-over-Federal-Rules-Can-Get-in-the-Way-of-Smart-School-Spending.pdf?x91208.

Federal funds come with a host of conditions. In 2006, for example, the Department of Education estimated that Title I—the most prominent source of federal funds—contained more than 500 discrete compliance requirements. *See* U.S. Dep't of Educ., Off. of Inspector Gen., Compliance Requirements Within Title I, Part A of the No Child Left Behind Act (Mar. 29, 2006). These requirements have a significant effect on state education policy, structuring the standards state school systems set, the assessments they use to test those standards, and the indicators they use to evaluate those assessments. *See* 20 U.S.C. § 6311. Local school districts must meet an even lengthier list of requirements, encompassing everything from the way they monitor student progress to their efforts at "reduc[ing] the overuse of discipline practices that remove students from the classroom." § 6312(b)(11). Other requirements include:

- Eligibility rules that define a class of participants or beneficiaries for federally funded activities;

27

- Use-of-funds rules, including earmarks or spending caps, that limit the categories of services that grants can sustain;

- Planning requirements that oblige schools and districts to develop detailed and formulaic written plans describing program implementation;

- Financial tests districts must pass to show that federal funds "supplement, not supplant," state and local funds;

- Reporting requirements that compel schools to gather and submit information to the Department of Education; and

- Spending time frames, which may be variable depending on the program and the year.

Junge & Krvaric, *supra*, at 2; *see, e.g.*, 20 U.S.C. §§ 6311–6315, 6320–6322. School districts must also follow federal paperwork rules, procurement rules, inventory management rules, and accounting standards. Junge & Krvaric, *supra*, at 2. This surfeit of rules imposes significant compliance costs. For instance, a 2010 report by the Department of Education found that it cost the median state $9.6 million just to develop the assessments required by federal law, and another $7.5 million a year to administer those assessments. *See* Dep't of Educ., Accountability Under *NCLB*: Final Report 19, 21 (2010).

Genuine consequences follow noncompliance: additional oversight, further layers of rules, directives to change practices, or even repayment. Junge & Krvaric, *supra*, at 3; *see, e.g.*, 34 C.F.R. §§ 76.900-910, 81.30. The Secretary of Education may disapprove state plans that fail to meet statutory requirements, causing states to lose Title I funding altogether. 20 U.S.C. § 6311(a)(4)(A)(vi). The conditions on federal funding thus provide

the federal government significant leverage over local school districts. And Title I is by no means the only source of funding—the Department of Education in fact lists no fewer than 264 total grant programs. *See List of ED Programs*, Dep't of Educ., https://www2.ed.gov/programs/find/title/index.html?src=grants-page. Many of these programs come with numerous conditions and requirements, further structuring the way that states and local governments operate their schools. *See, e.g.*, 20 U.S.C. § 1413 (providing detailed requirements for school districts to receive funding under the Individuals with Disabilities Education Act).

Federal funding programs implicate Title IX since they each "extend[] Federal financial assistance" so as to invoke Title IX's nondiscrimination requirements. 20 U.S.C. §§ 1681, 1687. These regulations cover everything from housing to vocational education to counseling to athletics and to the prescription of detailed grievance processes. *See* 34 C.F.R. § 106.30–45. The requirements are comprehensive: in 2020, regulations implementing even minor changes in Title IX's network of requirements generated 554 pages of the Federal Register. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). And the ultimate penalty for violating Title IX is again severe: "Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity . . . or (2) by any other means authorized by law . . . ." 20 U.S.C. § 1682. Even if educational institutions do not lose their funding, they labor continually under such a threat.

In toto, the expansion of the federal regulatory presence has spawned not only a cadre of compliance officers, but school environments which seem to feature more assistant deans and assistant principals than actual teachers themselves. This large transfer of power over education from state and local governments to the federal government provides the backdrop for any interpretation of Title IX. If recipients of Title IX funds wish to contractually cede some amount of control over schools to the federal government, they certainly may do so. But they must be told what they are giving up. In cases of ambiguity and uncertainty where integral state functions such as education are involved, *Pennhurst* commands that the state get the benefit of the doubt.

III.

A concern for federalism need not cast aspersions on Title IX or other federal education programs. The enumerated powers of Congress are broad, and these programs have conferred real benefits on states and localities, prompted them to include the once excluded, and generally spurred them to up their game. Title IX in particular has measurably increased women's opportunities and participation in sports and other activities. "It is undisputed that Title IX . . . has had a tremendous impact on women's opportunities in intercollegiate athletics, and thus has enabled women to reap the myriad benefits of participation in athletic programs." *Nat'l Wrestling Coaches Ass'n v. U.S. Dep't of Educ.*, 263 F. Supp. 2d 82, 93–94 (D.D.C. 2003). And quite beyond that, Title IX has also helped reverse the significant barriers to success in higher and secondary education faced by women at the time of its passage. *See* R. Shep Melnick, *The Strange Evolution of Title IX*, Nat'l Affairs (Summer 2018).

Real success, however, has not been without real costs. I do not believe that the ever-deeper subordination of state and local school systems to federal oversight is consistent either with historical practice or our constitutional design. The numbing mass of federal regulation with its bureaucratic accompaniments must at some point deaden the initiative that is the hallmark of our federal system and dim the spontaneity and spark that the great teachers have always brought into their classrooms.

At what point the balance tips is not for the inferior federal courts to determine. *Pennhurst* and its progeny are our constitutional guide. *Pennhurst's* clear statement rule has not been remotely satisfied here. This school district, and school systems throughout our country, stand deprived of the prior notice that is the essence not only of due process but of contractual obligation. The prospect of liability is imposed on districts wholly in the dark about the harassing incidents and in the absence of any causation of the injury, which is an element of the most basic actions in tort. I see nothing to indicate that Congress believed state and local school systems were incapable of handling the mine run of student interactions without the intrusion of federal machinery. And yet here we are. Liability through ambush is exactly what *Pennhurst* warned against and it is exactly what has come to pass.

NIEMEYER, Circuit Judge, dissenting from the denial of rehearing en banc:

The panel majority opinion in this case, as to which an en banc rehearing has been requested, extends the liability of a high school under Title IX to cover damages sustained by a student from a single, isolated incident of student-on-student sexual harassment, of which the school had no knowledge until after the fact. Indeed, the opinion recognizes that the school did not cause the incident and cannot be imputed with prior knowledge of the incident. Yet, it permits school liability to rest on the fact that the school did not discipline the offending student after conducting an investigation into the incident. In holding the School Board can be held liable in these circumstances, the panel majority now steps clearly beyond the limits of Title IX liability imposed by the Supreme Court in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

Title IX does not explicitly create a right of action. Rather, it simply prohibits schools that receive federal funds from discriminating on the basis of sex, providing in one sentence: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The Supreme Court, however, has found an implied private right of action in the provision that permits students to sue educational institutions for damages. *Cannon*, 441 U.S. at 688–89; *Franklin v. Gwinnett Cnty. Public Schools*, 503 U.S. 60 (1992). But

32

in doing so, the Court has expressly rejected any notion that schools face strict liability under Title IX or can be imputed with liability under principles of agency or constructive notice. *See Gebser*, 524 U.S. at 285.

Indeed, the Court limited school liability further, requiring that the school's *own conduct be the cause* of the sexual harassment or discrimination. For instance, in *Gebser*, the Court held that a school can only be held liable in damages for a teacher's sexual harassment of a student where the school had "actual knowledge" (i.e., "notice") of the harassment in circumstances where it had an *opportunity* to rectify it but instead failed to end or prevent the harassment through its deliberate indifference. 524 U.S. at 289–93. In short, the Court said, the school's deliberate indifference must be "the *cause* of the violation." *Id*. at 291 (emphasis added).

Were this not sufficiently clear, the Court repeated the same requirement in its decision in *Davis*, this time in the context of a school's liability for student-on-student harassment. After reiterating that Title IX did not permit imputed school liability based on agency principles or constructive notice, the Court made clear that only the independent conduct of the school *causing* harassment could result in the school's liability. It explained, "recipients [of federal funds] could be liable in damages only where their own deliberate indifference effectively *caused* the discrimination." *Davis*, 526 U.S. at 642–43 (emphasis added) (cleaned up). Thus, for a school that does not directly discriminate, harassment must occur after it receives notice — making it something that the school could have prevented. Indeed, the *Davis* Court specifically found that Congress would not have

33

wanted "the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment" and explained that "[b]y limiting private damages actions to cases having a *systemic* effect on educational programs or activities," it was "reconcil[ing] the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior." *Id.* at 653 (emphasis added).

The panel majority simply fails to recognize these constraints on school liability, creating liability based on an irrelevant argument. Judge Wynn now posits that it would be "absurd" to require students to be "sexually harassed or assaulted at least *twice* before a school can be held liable," arguing that "schools do not get 'one free rape.'" *Supra* at 14–15. But nothing under the Supreme Court's jurisprudence suggests that that is the consequence. Rather, the Court concludes simply that school liability must be based on the *school's own conduct* "effectively caus[ing] the discrimination." *Davis*, 526 U.S. at 642–43 (cleaned up).

Here, such evidence of school conduct is totally lacking, as the jury found. The facts are clean and straightforward. During a band trip to perform at a music festival, a male student at the high school engaged in sexual touching of a fellow female student while the two were sitting together under a blanket on a bus. The female student later told school officials about what had happened and told them that the touching was not consensual. The school thereafter conducted an investigation and, receiving somewhat conflicting accounts, concluded that a "sexual assault" had not occurred. Accordingly, it imposed no discipline

34

on the male student, although it did provide a number of accommodations requested by the female student.

The record shows that the incident was a single, isolated act of student-on-student sexual harassment, about which the school had no prior notice and which did not indicate anything systemic. Indeed, similar conduct was never repeated. The female student, however, sued the School Board, alleging that the school acted with deliberate indifference to her report of the incident, but the jury found that because the school had no notice of the harassment, the School Board was not liable.

The panel majority reversed the verdict, based essentially on the school's refusal to discipline the male student. But this is not a sufficient basis to create school liability in the circumstances.

This case is especially important as a legal matter because it strikes out on a new course for school liability under Title IX, imposing what sounds very much like strict liability, which the Supreme Court has rejected. Regardless of the position that any judge on this court might take following an en banc rehearing, the issue is sufficiently important to meet our standard for such a rehearing, and I am puzzled why we voted 9–6 not to rehear the case. Regretfully, we now leave the Supreme Court as the only possible venue for review of this important legal issue that will implicate educational institutions across the country.