**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12547

————————————————

C. W.,
    by and through his next friend MARY DOE,

                                        *Plaintiff-Appellant,*

*versus*

STEVE SMITH,
PIEDMONT CITY SCHOOL DISTRICT,

                                        *Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:23-cv-00368-CLM

————————————————

Before WILLIAM PRYOR, Chief Judge, and LAGOA and KIDD, Circuit
Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the ban of "discrimination on the basis of sex," under Title IX of the Education Amendments of 1972, covers the sexual harassment of a football player. C.W., a freshman football player at Piedmont High School, faced a campaign of emasculatory harassment culminating in an attempted sexual assault. He reported the harassment to school officials, including the football coach, Steve Smith. The school issued a perfunctory punishment to the offenders. And Smith called C.W. "soft" in front of the team. The harassment continued until C.W. transferred to another school. He later sued the Piedmont City School District and Smith for violating his rights to be free from sexual harassment under Title IX and the Equal Protection Clause of the Fourteenth Amendment. The district court dismissed his complaint. Because C.W. alleged a plausible claim of sexual harassment, we vacate and remand.

## I. BACKGROUND

When evaluating a dismissal order, "we recount and accept the allegations of [the] complaint as true." *McCarthy v. City of Cordele*, 111 F.4th 1141, 1144 (11th Cir. 2024).

C.W. was a male freshman student at Piedmont High School in August 2022. Piedmont High School is administered by Piedmont City School District. The District receives federal funds governed by Title IX. *See* 20 U.S.C. § 1681(a). Steve Smith, the other defendant in this lawsuit, was "Head Football Coach and Athletic Director at Piedmont High School." He was "responsible for

protecting, supervising, and disciplining students and players" at the school.

"Keying" is a "long-standing practice" in the football program at Piedmont High. Players "key" "younger male players by forcing a car or truck key into a player's anus and twisting it." Older players "specifically target[] young male freshm[e]n" for keying. Keying has been around "long enough," and has been practiced "often enough," that it was known to coaches, including Smith. In September 2020, three students were charged with assault for keying a younger player. That assault led to a civil lawsuit against the District and Smith. Smith did "nothing" to "protect football players" going forward.

C.W. entered the Piedmont football program in August 2022. He was 15 years old and weighed "approximately 130 pounds." He was subjected to bullying from the beginning. In one instance, a player grabbed C.W.'s arm and pulled him over to another boy, who was exposing his genitals. "The goal of this interaction was to force C.W. to look at [the other boy's] private parts and call him 'gay' for looking." C.W. had told these students that he was not gay. On August 19, another football player grabbed C.W.'s chest "around his nipple" and "twisted his hand."

On August 25, C.W. and four other students were in the locker room alone. Smith had sent them there to "go work out . . . for an unknown reason" while the rest of the team watched film in class. One of the older players asked C.W. if he felt bullied, and C.W. said that he did not. The other player said, "well that is too

bad." The older players then explained a "2019 incident" where an upperclassman "keyed" "another male student." One of the students, who was holding a set of keys, told C.W., "we are going to key you." C.W. declined and walked to the other side of the room. The other students followed him and discussed "loudly . . . the sexual assault they intended to subject C.W. to." They also "spoke loudly about 'gay sex,'" and told C.W. he "should not worry because they had 'gay family members.'" They surrounded him and blocked his exit. C.W. tackled one of the players to try to escape but "was beaten up" by the four students. He "sustained minor injuries."

C.W. reported the assault to his mother that day, who in turn reported it to the police. The next day, the principal called C.W. to his office for a meeting with Smith. During that meeting, Smith told C.W. that he was "taking it too seriously." The principal and Smith also called the other involved students in for a separate meeting. One of the students told the principal that "if you do something wrong or tell on someone you can get keyed . . . . I am sure you know what happened. . . . It still goes around. It is a drifting treat."

After reporting the assault, C.W. faced more taunting from the other players. They "slapped his butt" and made fun of him for "chicken[ing] out," calling him a "snitch" and a "pussy." The day after the meeting with the principal, Smith met with the football team. During this meeting, he talked about the "good old days" when students had more freedom at the school. He also told the

team that "you should not make fun of people that are easily of-fended," and said while looking at C.W., "I am speaking in code." He also said that "soft people look for reasons to be mad."

The involved students faced only minor discipline. Two were children of senior staff at the school. All four received only six months of "observation," where the school promised to act only if something happened again. C.W. later transferred to a different high school in a neighboring county.

C.W., through his next friend Mary Doe, sued Smith, the District, and the involved students in March 2023. He sued the District for violating Title IX, 20 U.S.C. § 1681(a), and Smith for violating the Equal Protection Clause, 42 U.S.C. § 1983. He also sued Smith under Alabama tort law. He later amended his complaint to remove the student defendants.

The District and Smith both moved to dismiss the amended complaint. They argued that C.W. had not pleaded harassment based on sex, as required for their conduct to be a violation of Title IX or the Equal Protection Clause. The District also argued that he had not pleaded the "severe and pervasive" harassment required to state a claim of sex discrimination. Smith requested qualified immunity and argued that, without a viable federal claim, the district court should not exercise jurisdiction over the state-law claims.

The district court granted both motions to dismiss. It ruled that C.W. had not pleaded that he was "bullied because he was male" or that Smith knew about his bullying. It allowed C.W. to amend his complaint to cure these deficiencies.

C.W. filed his second amended complaint in January 2024. He clarified that the harassment was sex-based because the bullying he faced was intended to emasculate him. Both defendants again moved to dismiss on substantively similar grounds.

The district court granted both motions. It ruled that the harassment C.W. faced was "more likely explained by anti-freshman bias" than anti-male bias, so the harassment was not covered by Title IX, which reached only "the differential treatment of males and females." The district court also ruled that C.W. did not meet any of the three scenarios used in Title VII jurisprudence to identify actionable same-sex sexual harassment. The district court ruled that Congress had not "unambiguously" prohibited same-sex sports hazing under Title IX, as required for a Spending Clause statute. It rejected the Equal Protection claim because he did not identify a comparator treated better than him because of sex. And although C.W. had pleaded enough facts to establish that Smith was indifferent to the bullying on his team generally, he did not plead facts that would establish that Smith "knew of and acquiesced in" the bullying of C.W. The district court also ruled that Smith was entitled to qualified immunity because he had violated no constitutional right. Finally, the district court declined to exercise supplemental jurisdiction over the state-law claims against Smith because it had dismissed the federal claims.

## II. STANDARD OF REVIEW

"We review *de novo* the dismissal of a complaint for failure to state a claim." *Evanto v. Fed. Nat'l Mortg. Ass'n*, 814 F.3d 1295,

1297 (11th Cir. 2016). "We accept a complaint's well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1277 (11th Cir. 2025).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that C.W. plausibly complained that the District violated Title IX. Second, we explain that C.W. plausibly complained that Smith violated the Equal Protection Clause.

*A. C.W. Plausibly Pleaded that the District Violated Title IX.*

Title IX bars discrimination "on the basis of sex" in any educational program receiving federal funds. 20 U.S.C. § 1681(a). Discrimination on the basis of sex includes "student-on-student sexual harassment, if sufficiently severe." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). School districts are liable for sexual harassment if they are "deliberate[ly] indifferen[t] to known acts of harassment." *Id.* at 633, 643.

To prevail against a school district on a claim of deliberate indifference to sexual harassment, a student must satisfy a four-part test. First, the school must be a Title IX funding recipient. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007). Second, "an 'appropriate person' must have actual knowledge" of the harassment. *Id.* (citation omitted). Third, the recipient must act with "deliberate indifference to known acts of harassment in its programs or activities." *Id.* (citation and internal quotation marks omitted). This harassment must be sex-based: only

"[s]exual" harassment "is discrimination in the school context under Title IX." *Id.* (citation and internal quotation marks omitted). Fourth, the harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

The District disputes only the third and fourth elements. The District does not argue that it lacked "actual knowledge" of the harassment. It argues that C.W. failed to allege sexual harassment that violates Title IX. But, as we explain below, we reject this conclusion. In addition, Smith had "actual knowledge" of the sexual harassment, and both he and the other school administrators displayed "deliberate indifference" to C.W.'s right to be free from it.

Our discussion proceeds in two parts. First, we explain that C.W. was subjected to sexual harassment when he was harassed for failing to conform to sex stereotypes. Second, we explain that the harassment was "severe, pervasive, and objectively offensive" under *Davis*.

### 1. C.W. Faced Sexual Harassment.

C.W. gives us two theories to support his claim of sexual harassment: first, that the harassing conduct was based on his failure to conform to sex stereotypes, and second, that the harassing conduct was inherently sexual. We conclude that he stated a claim for harassment under both.

### a. C.W. Faced Harassment Based on Sex Stereotypes.

Title IX prohibits discrimination based on sex stereotypes. Discrimination based on sex stereotypes is already actionable as discrimination based on sex under Title VII. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989). C.W. argues, and the District does not dispute, that Title IX similarly bars stereotype discrimination. The Supreme Court has often relied on Title VII caselaw to develop its Title IX jurisprudence. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992). And it makes sense to do so here. *See Wolfe v. Fayetteville Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) (holding a student bringing a Title IX suit was "legally required to show" that "harassment was motivated by either [the student]'s gender or failure to conform with gender stereotypes").

The district court, relying on our decision in *Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), ruled that "differential treatment of a man because he is 'less masculine' than other men" cannot trigger Title IX liability. In *Adams*, we decided that a school policy "separating bathrooms based on biological sex" was permissible under Title IX. *Id.* at 798, 800. To be sure, we held that "biological sex . . . is not a stereotype." *Id.* at 809, 813. But our decision turned on the fact that the policy expressly distinguished between students based only on "biological sex," and did "not depend in any way on how students act or identify." *Id.* We never denied that discrimination because of stereotypes drawn "on the basis of sex" violates Title IX.

C.W. plausibly alleges that he suffered harassment based on sex stereotypes. He alleges that he was young and lightweight. He alleges that Smith suggested to the other players that he was "easily offended" and "soft," leading to further harassment. These facts support an inference that he did not conform to the football team's stereotypes of masculinity. C.W. also alleges physical harassment designed to emasculate him, including nipple-twisting, butt-slapping, and attempted anal penetration. These incidents support the reasonable inference that the harassing students "belittle[d]" C.W. and treated him as a "lesser man" than his fellow players. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (en banc). C.W. also alleges verbal harassment, including slurs designed to undermine his masculinity. The term "pussy" "insults the man by comparing him to a woman," which suggests a lack of masculinity. *Id.* Repeated insinuations that C.W. was "gay" serve a similar purpose. Attempts to force C.W. into a stereotypically gay role by forcing him to look at another boy's genitals or subjecting him to anal penetration are plausibly emasculatory given their "social context." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

The District argues that C.W. never alleges he was called gay but says only that "the goal" of a teammate forcing him to look at another player's genitals "was to . . . call him gay." But a jury could certainly infer that being forced to look at another boy's genitals was emasculatory, regardless of the specific words used. And a jury could also find that the players' talk of "gay sex" and their

"gay family members" before they attempted to anally penetrate him implied that C.W. too was gay.

The District parrots the reasoning of the district court that the students' conduct was motivated by anti-freshman bias, instead of an intent to harass men. But sexual harassment of a subset of the targeted sex remains sexual harassment. The harassment of men based on their failure to conform to male stereotypes does not cease to be actionable under Title IX when the harasser targets only men who are freshmen—just as the harassment of women does not cease to be actionable under Title VII when the harasser targets only women who are "aggressive" in the workplace. *Price Waterhouse*, 490 U.S. at 250. This principle especially holds here because C.W.'s status as a freshman reinforced the sex-based stereotypes he faced: that he was too lightweight and "soft" to be a "manly . . . man." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 459 (5th Cir. 2013) (en banc).

The District argues that some of the alleged sex-related behavior—like being called a "pussy"—was retaliation for reporting the keying incident, not harassment based on sex. But retaliatory sex-based harassment also violates Title IX. *See, e.g.*, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 680–84, 693 (4th Cir. 2018) (holding that a group of female students had "sufficiently alleged a sex discrimination claim under Title IX" for a campaign of sexual harassment in response to feminist activism). That point is doubly true when a jury could reasonably infer that C.W.'s reporting of his

harassment itself defied the football team's sex stereotypes. Smith told the team that C.W. was "soft" after he reported the assault.

### b. C.W. Faced Inherently Sexual Harassment.

Title IX also prohibits harassment that is inherently sexual in nature, even if the harassers are not motivated by sexual desire. Same-sex sexual harassment is already actionable as discrimination under Title VII. *See Oncale*, 523 U.S. at 80. And *Oncale* envisions that sexual harassment may be motivated by "sexual desire," "general hostility to the presence of [the victim's sex] in the workplace," or differential treatment in the workplace, among other things. *Id.* at 80–81. We see no reason to depart from our Title VII jurisprudence in construing Title IX in this appeal. *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (holding that "[s]ame-sex sexual harassment is actionable under title IX"); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65–66 (1st Cir. 2002) (holding that "same-sex harassment is cognizable under Title IX"). So like Title VII, Title IX reaches *inherently sexual* same-sex sexual harassment.

"Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" *Davis*, 526 U.S. at 651 (quoting *Oncale*, 523 U.S. at 82). Courts should consider "the ages of the harasser and the victim and the number of individuals involved," and "bear in mind that . . . children may regularly interact in a manner that would be unacceptable among adults." *Id.* Indeed, because "acts of teasing and name-calling" are common in

schools, mere "comments target[ing] differences in gender" are insufficient to establish Title IX liability. *Id.* at 652.

Mindful of the Supreme Court's instruction to consider social context, we hold that a factfinder could infer from the facts as pleaded that the alleged conduct is not "simple teasing or roughhousing," *Oncale*, 523 U.S. at 82, but instead sexual harassment. C.W. plausibly alleges that he was subjected to offensive touching with overt sexual overtones, including being forced to look at another boy's genitals. A boy grabbed his chest around his nipple. He was subjected to repeated incidents of butt-slapping after the keying incident. And, of course, four players attempted to sexually assault him using a car key. Courts around the country have consistently concluded that physical acts of offensive touching, including "grabbing, poking, rubbing or mouthing areas of the body linked to sexuality," amount to sexual harassment. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065–66 (9th Cir. 2002) (en banc) (collecting cases). Here we have "numerous acts of objectively offensive touching" coupled with verbal harassment. *Davis*, 526 U.S. at 653. We have affirmed that such a course of offensive touching may give rise to a Title IX claim. *See Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015) (holding that repeated propositions for sex, followed by a sexual assault, was Title IX harassment).

The District argues that "butt-slapping and nipple twisting" is the "type of horseplay" expected on a football team. But this argument fails to account for the other incidents, most notably the attempted sexual assault that preceded the purported "horseplay."

And sexual assault, attempted or completed, is inherently sexual harassment. *See, e.g.*, *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (holding that "[r]ape is also, by definition, a form of harassment based on sex"); *Brock v. United States*, 64 F.3d 1421, 1423 (9th Cir. 1995) (holding that "every rape committed . . . is also discrimination based on . . . sex").

The District suggests that C.W.'s allegations about the keying incident do not support the inference that the players intended to sexually assault him. If we adopt this argument, it is hard to imagine how a student *could* allege an attempted sexual assault. C.W.'s attackers told him "we are going to key you" and surrounded him while discussing "gay sex." These statements are enough to "draw the reasonable inference" that they intended to assault him. *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (citation and internal quotation marks omitted).

The District argues that C.W. did not sufficiently allege harassment under any of the *Oncale* scenarios. In *Oncale*, the Supreme Court presented three scenarios that could "support an inference of discrimination on the basis of sex." 523 U.S. at 80–81 (listing same-sex harassment "motivated by sexual desire," harassment "motivated by general hostility to the presence of [that sex] in the workplace," and differential treatment of the two sexes). But *Oncale* does not suggest that its scenarios are exhaustive. Instead, it introduces them using phrases like "[a] trier of fact might reasonably find such discrimination, for example, if," and closes its discussion by saying plaintiffs may "choose[] to follow" "[w]hatever

24-12547                Opinion of the Court                15

evidentiary route," so long as they prove discrimination because of sex. *Id*. And every circuit to consider the question has decided that the *Oncale* scenarios are illustrative, not exhaustive, of the types of harassment that can constitute sex-based harassment. *See, e.g.*, *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 120 (4th Cir. 2021); *Boh Bros. Constr. Co.*, 731 F.3d at 455; *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001).

Finally, the District echoes the ruling by the district court that "Title IX did not unambiguously prohibit same-sex acts of sports hazing or speech that challenges masculinity." Because Title IX was enacted under Congress's Spending Clause power, any conduct it prohibits must be prohibited "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). We have held that Congress can satisfy the requirements of the Spending Clause by creating "a clear and actionable prohibition of discrimination," even if the "manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Because Title IX's prohibition on sex discrimination is "clear and actionable," an express provision prohibiting same-sex sports harassment is not required. The Supreme Court has applied Title IX to student-on-student harassment and retaliation, even though neither application is obvious from the face of the statute. *See Davis*, 526 U.S. at 633; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182 (2005). We have no doubt that in the light of the "clear prohibition of discrimination in Title IX," federal funding recipients had "adequate notice" that "severe student-on-student harassment was actionable." *Benning*, 391 F.3d at 1306.

2. C.W. Alleged Severe, Pervasive, and Objectively Offensive
Harassment.

To hold a school district liable under Title IX, a student must prove "that the discrimination was severe, pervasive, and objectively offensive." *Williams*, 477 F.3d at 1297 (citation and internal quotation marks omitted). "The behavior must be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003). In deciding that issue, we look to the "surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and victim, and the number of individuals involved." *Id*. Although the district court did not address this element of the deliberate-indifference test, the District argues that it gives us an independent reason to affirm. We disagree.

C.W.'s complaint permits the inference that the harassment satisfied the thresholds required by Title IX. The primary conduct took place over only the first two weeks of school. In that time, and in the immediate follow-up, C.W. was subjected to multiple incidents of butt-slapping, one incident of nipple-twisting, and one incident where a boy forced him to look at another boy's genitals. In addition, he was nearly forcibly anally penetrated. This sort of "[d]irect contact with . . . intimate body part[s] constitutes one of the most severe forms of sexual harassment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012).

This harassment was sufficiently severe, pervasive, and objectively offensive that it forced C.W. to leave the Piedmont High football program. C.W. alleged that his "mood and enthusiasm" for the football program evaporated due to the harassment. And he alleged that the harassment caused him to transfer to another school. The harassment denied him "access to the educational opportunities" at Piedmont High. *Davis*, 526 U.S. at 650; *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 699 (4th Cir. 2007) (en banc) (concluding that sexual harassment of a collegiate soccer player denied her access to educational opportunities because the effects on her mood "had a negative impact on her participation and performance in soccer and on her academic performance"). The District argues that none of the incidents "involved a sexual assault" and that all but the butt-slapping were infrequent because they only occurred once. But C.W. alleged an attempted sexual assault, which satisfies our severity analysis. *Cf. Hill*, 797 F.3d at 973 (holding that a jury could find severe and pervasive harassment where a sexual assault "was the culmination of . . . two weeks of harassment"). And given the short period over which the multiple acts of harassment took place, C.W. alleged pervasive harassment.

### B. C.W. Plausibly Pleaded that Smith is Liable Under Section 1983.

The Equal Protection Clause bars officials from acting with "deliberate indifference to known sexual harassment." *Id.* at 978 (citation and internal quotation marks omitted). To establish deliberate indifference, a student "must prove the individual defendant actually knew of and acquiesced in the discriminatory conduct." *Id.*

18                    Opinion of the Court                    24-12547

(citation and internal quotation marks omitted). C.W. argues that Smith violated the Equal Protection Clause by his "inadequate response to known sexual harassment." Smith argues that he escapes liability under qualified immunity.

We address both arguments. First, we explain that Smith's conduct violated the Equal Protection Clause because the students' conduct constitutes sex-based harassment and Smith knew of and acquiesced in the harassment. Second, we explain that Smith may not avail himself of qualified immunity because his alleged conduct violated clearly established law.

### 1. Smith Was Deliberately Indifferent to Sex-Based Harassment.

The district court rejected C.W.'s argument that Smith knew of and acquiesced in his sex-based harassment for two reasons: first, because C.W. had not alleged sexual harassment, and second, because C.W. did not allege enough facts to allow an inference that Smith knew of and allowed his harassment to continue. We disagree.

#### a. C.W. Plausibly Pleaded Sexual Harassment.

C.W. states a claim of sexual harassment under the Equal Protection Clause both because his harassment was based on sex stereotypes and because his harassment was inherently sexual. Discrimination based on a failure to conform to sex stereotypes violates the Equal Protection Clause. *Glenn v. Brumby*, 663 F.3d 1312, 1319–20 (11th Cir. 2011). As explained above, a jury could reasonably infer that the football players' actions were designed to humiliate and emasculate C.W. for his failure to conform to sex

stereotypes. So he has plausibly alleged discrimination based on sex stereotypes.

Inherently sexual harassment is also discrimination based on sex under the Equal Protection Clause. We have explained before that "Title IX and [section] 1983 sexual harassment claims are similar." *Hill*, 797 F.3d at 976. Our analysis of the differences between the claims pointed to differences in the theory of liability and not differences in the test for whether *harassment* is sex-based. *See id.* at 976–77. *Hill* instead assumed that sexual harassment under Title IX is also barred by the Equal Protection Clause. *See id.* at 978 (explaining that "[f]or the reasons explained above in our Title IX analysis," a factfinder could infer that an official was deliberately indifferent to sexual harassment). Because a jury could reasonably infer that a course of sexual contact including an attempted sexual assault violated C.W.'s "federal constitutional right to be free from sex discrimination," he has pleaded a violation of the Equal Protection Clause. *Williams*, 477 F.3d at 1300.

The district court misapplied our sexual harassment standards. According to the district court, our decision in *Jones v. Ray*, 279 F.3d 944 (11th Cir. 2001), required C.W. to prove that "Smith treated other similarly situated persons better than C.W." and that C.W.'s worse treatment was "because of a constitutionally protected interest like race or sex." But *Jones* drew this test from our disparate-treatment jurisprudence. *See id.* at 946–47 (quoting *Damiano v. Fla. Parole & Prob. Comm'n*, 785 F.2d 929, 932–33 (11th Cir. 1986)). C.W. does not allege a claim of disparate treatment—he

alleges a claim of sexual harassment, to which we apply the deliberate-indifference test. *See Hill*, 797 F.3d at 978.

Smith's attempts fare no better. First, he argues that C.W. must allege that "Smith did not protect him on the basis of his male gender." But we require only that a school official be deliberately indifferent *to* sexual harassment, not that the deliberate indifference be sex-based. *See id.* Second, Smith reiterates many of the arguments made by the District against C.W.'s stereotype discrimination theory. We rejected those arguments for the Title IX claim, and Smith offers no reason to treat the Equal Protection Clause differently.

### b. C.W. Plausibly Alleged that Smith Knew of and Acquiesced in the Harassment.

The district court concluded that although C.W. "pleaded facts that, if true, would prove Smith was indifferent to hazing generally and insensitive to C.W.," he did not plead "deliberate indifference" to C.W.'s specific harassment. Again, we disagree. C.W. alleged deliberate indifference.

Our law establishes that, when an administrator receives a report of a sexual assault, "doing nothing [is] a deliberately indifferent response." *Id.* at 979. In *Hill*, a principal investigated a sexual assault, discussed a punishment with other school officials, suspended the assaulter, and referred the assaulter to the school board. *Id.* at 963–64. But because the principal "did virtually nothing" to remedy the "glaring inadequacies" in school policies that facilitated

the assault, we held that a factfinder could conclude the principal was deliberately indifferent. *Id.* at 978–79.

Taking C.W.'s well-pleaded allegations as true, Smith's only response was to attend a meeting with the involved students and to call a meeting of the football team. In that meeting, Smith implied that C.W. was "easily offended" and "soft." He told the players he was speaking in code. A jury could reasonably infer that Smith intended to convey, and the players understood, that he did not consider the assault a problem and that he would not take steps to prevent future harassment. Indeed, the students on the football team continued to harass C.W. after the meeting.

The meager punishment meted out to the harassing students does not foreclose a finding of deliberate indifference. "Observation," as pleaded, means only that the school would act if the students attempted another sexual assault. That punishment is hardly even a deterrent. A jury could reasonably infer that "observation" will not remedy any of the "glaring inadequacies" in the football program exposed by the attempted sexual assault. *Id.* at 978. Smith was aware that keying was an endemic practice in the Piedmont High football program. He was on notice that unless something changed, the conduct was likely to recur. The decision not to address the conditions that facilitated the assault points to "a pervasive practice or custom of ignoring the bullying directed at [students]," of which C.W. was only the most recent victim. *Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1274 (11th Cir. 2023).

The district court concluded that C.W. did not allege that Smith knew of the harassment before the attempted sexual assault. But Smith's post-assault conduct is sufficient to support a reasonable inference of deliberate indifference. C.W. alleged a violation of his constitutional rights.

### 2. Smith is Not Entitled to Qualified Immunity.

Smith invokes qualified immunity from suit. Qualified immunity shields officials from being sued "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Smith contends that he lacked the notice necessary to overcome his defense of qualified immunity.

We follow a two-step inquiry to determine if qualified immunity applies. First, we "decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). Second, we "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id*. (citation omitted). We have already settled the first question; we move to the second. This question turns on whether "the government official had fair warning" that his conduct was illegal. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).

C.W. identifies *Hill* as the decision that put Smith on notice of his rights. To be sure, the facts of *Hill* are more egregious, but the differences are immaterial. C.W. may overcome qualified

immunity if "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). *Hill* made clear that a reasonable school official "would not have believed doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation." 797 F.3d at 979.

Based on the reasoning of *Hill*, Smith should have known that his alleged conduct clearly violated federal law. He presided over a team with an established history of sexual assault. When presented with a reported sexual assault, he did *nothing* to change the underlying conditions on the team. He did the opposite: he communicated to the players that C.W. was "soft" and could continue to be harassed without serious consequence. Every reasonable official in his position would know that response violated federal law. Smith is not entitled to qualified immunity.

## IV. CONCLUSION

We **VACATE** the order dismissing C.W.'s complaint.

24-12547    LAGOA, J., Concurring in Part and Dissenting in Part    1

LAGOA, Circuit Judge, concurring in part and dissenting in part:

I concur in part and dissent in part.  I concur with vacating the district court's order dismissing C.W.'s second amended complaint.  At this procedural stage, we take all allegations as true and I agree that the second amended complaint's allegations state a claim for student-on-student harassment under Title IX.

Under Title IX, a plaintiff may recover from a school district for "student-on-student harassment" in "certain narrow circumstances." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007).  To recover, a plaintiff must prove four elements: that (1) the defendant is a "Title IX funding recipient," (2) "an appropriate person must have [had] actual knowledge of the discrimination or harassment" alleged, (3) the funding recipient acted with "deliberate indifference to known acts of harassment in its programs or activities," and (4) the discrimination was "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* (citation and internal quotation marks omitted).  This inquiry focuses on the nature of the conduct and its impact, not the motivations or symbolic meanings attributed to the harasser's behavior.  As to the third element, the school district disputes only whether C.W. has alleged sex-based harassment.

The second amended complaint alleges that teammates attempted to anally penetrate C.W. with a car key.  This alleged conduct is inherently sexual and, standing alone, is sufficient to satisfy Title IX's requirement that the harassment be based on sex.

24-12547  LAGOA, J., Concurring in Part and Dissenting in Part    2

Indeed, in *Davis v. Monroe County Board of Education*, the Supreme Court found a viable Title IX claim where a fifth-grade student subjected a classmate to "numerous acts of objectively offensive touching," "sexually suggestive" conduct, and "verbal" harassment. 526 U.S. 629, 634, 653–54 (1999). Adopting language from its Title VII jurisprudence in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), the Court explained that "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships,'" *Davis*, 526 U.S. at 651 (quoting *Oncale*, 523 U.S. at 82). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. Courts should consider "the ages of the harasser and the victim and the number of individuals involved," and "bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. Under such a contextual analysis, allegations of unwelcome sexual conduct and offensive, sexual language suffice to plead a claim for harassment based on sex. This Court has previously reversed district court dismissals of such claims. *See, e.g., Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (reversing the district court's grant of summary judgment for the defendant on the plaintiff-student's Title IX claim where a teacher made "sexually suggestive comments" to students and touched them inappropriately); *Williams*, 477 F.3d at 1303 (reversing dismissal of Title

24-12547 LAGOA, J., Concurring in Part and Dissenting in Part      3

IX claim where student-plaintiff was raped by multiple student athletes).

I part ways, however, with the majority's holding that C.W. has also stated a claim based on sex-stereotyping. Unlike C.W.'s inherently sexual conduct theory of harassment, the Supreme Court has not extended Title VII's sex-stereotyping analysis into the school context. It is not necessary for us to do so here to resolve this appeal, nor do I believe it is prudent to do so. As a preliminary matter, "the instant appeal is about schools and children—and the school is not the workplace." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (en banc); *see, e.g., Davis*, 526 U.S. at 651 ("Courts, moreover, must bear in mind that schools are unlike the adult workplace . . . .").

We should resist reflexively importing Title VII doctrines into the student-on-student harassment framework under Title IX because the two statutes rest on different constitutional foundations, liability regimes, and institutional assumptions. Title VII is a direct regulation of employers grounded in Congress's Commerce Clause authority, and it contemplates *respondeat superior* liability and affirmative employer duties to prevent and correct workplace harassment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) ("Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible."); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) ("Title IX contains no

24-12547   LAGOA, J., Concurring in Part and Dissenting in Part      4

comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles.").

In line with Title VII's agency framework, *Price Waterhouse v. Hopkins* addressed employer decision-making under Title VII and focused on whether adverse employment actions were motivated by reliance on gender stereotyping.  490 U.S. 228, 250–52 (1989) (plurality opinion).  There, an accounting firm passed over a female senior manager for a promotion to the partnership because she was "macho" and needed to "walk more femininely, talk more femininely, dress more femininely, . . . and wear jewelry."  *Id.* at 235.  A plurality of the Court reasoned that, "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."  *Id.* at 250.  The Supreme Court held that the woman had an actionable claim under Title VII.  *Id.* at 250–51 (plurality opinion).

Title IX, by contrast, is Spending Clause legislation that operates like a contract: federal funds are conditioned on a recipient's agreement not to discriminate.  *See Gebser*, 524 U.S. at 285-86; *Davis*, 526 U.S. at 640.  As we recently explained, "Spending Clause legislation operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions.  But those conditions are binding only if they are clear and the recipient voluntarily and knowingly accepts the terms of th[e] contract."  *Joseph v. Bd. of Regents of the Univ. Sys. of Ga.*, 121 F.4th 855, 866 (11th Cir. 2024) (citation and internal quotation marks omitted).

24-12547 LAGOA, J., Concurring in Part and Dissenting in Part    5

This contractual framework has strong implications for how we interpret Title IX's scope and the theories of liability we may recognize. Because Title IX liability rests on the recipient's knowing acceptance of clear conditions, courts must be especially cautious before expanding liability theories beyond those clearly contemplated by the statute's text and the Supreme Court's precedents interpreting it. For that reason, the Supreme Court requires actual notice and deliberate indifference before a school may be held liable for damages. *Gebser*, 524 U.S. at 290–92; *see Joseph*, 121 F.4th at 866 (emphasizing the need for clear notice to funding recipients). Because Title IX liability does not turn on the subjective motives or biases held by the student harasser, importing a Title VII stereotyping framework focused on intent rather than conduct is a poor fit.

Moreover, including a sex-stereotyping analysis in the "on the basis of sex" element invites courts to police student interactions for implicit gender norms rather than focusing on whether the alleged harassment is sexual and whether it deprives a student of equal education access. Such a shift blurs the line between actionable sexual harassment, on the one hand, and non-sexual bullying or social conflict—precisely the expansion *Davis* sought to avoid. 526 U.S. at 652. Title IX does not federalize school discipline, and courts should be cautious not to articulate standards that could be read to convert the statute into a general anti-bullying mandate.

Because C.W.'s allegations involve conduct that is inherently sexual, I concur with the majority's holding that the complaint adequately pleads harassment on the basis of sex under existing Title

24-12547 LAGOA, J., Concurring in Part and Dissenting in Part      6

IX precedent.  In my view, however, it is unnecessary to import Title VII where the Supreme Court has not required us to and where there may be good reasons not to, given Title IX's distinct Spending Clause character.  Accordingly, I concur with the Court's judgment in all Parts except Part III.A.1.a. and Part III.B.1.a, in so far as it relies on the sex-stereotyping analysis.